## NATIONAL LABOR RELATIONS BOARD v. UNDERWOOD MACHINERY CO.

### No. 4427.

United States Court of Appeals, First Circuit.

Dec. 20, 1949.

Rehearing Denied Jan. 11, 1950.

Marcel Mallet-Prevost, Attorney, Washington, D. C. (David P. Findling, Associate General Counsel, Ruth Weyand, Assistant General Counsel, and Harvey B. Diamond, Attorney, all of Washington, D. C., with him on brief), for petitioner.

Maurice Epstein, Boston, Mass. (Benjamin E. Gordon and Gordon & Epstein, of Boston Mass., with him on brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The National Labor Relations Board filed its petition for enforcement of two orders issued against respondent, here consolidated for argument. The orders required respondent to cease and desist from refusing to bargain collectively with a designated union; from discouraging membership therein; and from interfering with, restraining, or coercing its employees in the exercise of their right to self-organization. They further required respondent to bargain collectively upon request with a designated union; to offer, when work was available, full reinstatement to his former position, or one substantially equivalent, to a certain employee; immediate reinstatement to their former positions to two other employees, all without prejudice to their seniority and other rights and privileges; to make whole these employees for any loss of pay suffered by reason of respondent's discrimination against them; and to post notices notifying all of its employees of its compliance with the foregoing.

Respondent, located in Boston, Massachusetts, is engaged in the manufacture of specially constructed machinery of all types; and its contracts with its customers often provided that it would design machinery to satisfy certain requirements in a customer's plant, build the machinery, erect it on the premises, commence its operation, and then turn it over to the customer.

The employees of respondent were distributed among three departments—the machine shop, plate shop, and erection and maintenance department.

The machine shop employs machinists, machine operators, and jig and fixture builders. Their duties are to machine the products ordered from respondent, a substantial portion of which goes to the plate shop for further assembly.

The plate shop, which consists of mechanics, layout men, and welders, fabricates and assembles sheet, plate, and structural steel products, including the material produced in the machine shop.

The erection and maintenance department includes millwrights, electricians, carpenters, and mechanics. This department is responsible for all maintenance and repair work necessary at respondent's plant. The employees in this department also install or erect at the plants of respondent's customers the machinery built by respondent according to customers' specifications. The work of installing machinery in the plants of respondent's customers is usually referred to as outside work, and the maintenance work in and around the plant is called inside or maintenance work.

Employees of the erection and maintenance department, in connection with erection of machinery, work away from the plant for varying periods of time, and sometimes take out-of-town trips. Occasionally men from the other departments of the plant go with the crew from the erection and maintenance department to assist in the erection and installation of the machinery, and sometimes additional men are hired to supplement the crew. Employees in the erection and maintenance department are the only maintenance workers employed by respondent; and when they are not on outside work, they are engaged in the maintenance of respondent's premises and machinery. On August 15, 1944, the International Union, United Automobile, Aircraft & Agricultural Implement Workers of America, CIO, hereinafter called the union, filed a petition for investigation and certification of representatives for a unit composed of all production and maintenance employees, including shipping employees, and excluding executives, supervisors, office clerical employees, and guards.

The Board thereafter conducted a hearing on the union's petition. At the hearing, respondent company contested the unit requested by the union, asserting that the employees of the erection and maintenance department should be excluded from the unit embracing the production employees of the machine shop and plate shop. After

a consideration of the facts, the Board found that the appropriate unit for the purpose of collective bargaining would be either: (a) the more inclusive unit, as proposed by the union, or (b) a unit of production employees, as proposed by respondent company.

The Board pointed out that the erection and maintenance employees had an obvious community of interest with the production employees, and that the erection and installation function appeared to be an integral part of production of the company's custom-made items. The Board, therefore, decided to ascertain the wishes of the erection and maintenance employees in the matter before making its final unit determination. In its decision and direction of elections, the Board ordered separate elections among the two employee groups, and stated that it would await the results of the elections before determining the appropriate unit. The Board further declared that if the union secured a majority of the votes cast by the production group only, it would find that that group, excluding the employees in the erection and maintenance department, constituted the appropriate bargaining unit; but that if, in addition, a majority of the employees in the erection and maintenance department also selected the union as their representative, the Board would include them in the unit composed of the production and maintenance employees.

The elections were thereafter held on November 17, 1944, and the employees voted overwhelmingly to be represented by the union. Of fifty-one eligible employees in the production unit (machine shop and plate shop), forty-nine voted: forty-eight for, and one against, the union. Of nine employees in the erection and maintenance group, eight voted for the union, and one was challenged by respondent. No objections to the conduct of the election having been filed, the Board decided that the employees of the erection and maintenance department should be included in the larger

unit, and, accordingly, on November 27, 1944, certified the union as the exclusive bargaining representative for all the employees in such unit.

On January 6, 1945, respondent filed with the Board a petition to vacate the certification of the union on the ground that the Board had improperly conducted the election before making its unit determination. It also contended that the election did not reflect the free choice of the employees because prior thereto, two of the respondent's supervisory employees had engaged in pro-union activities among the other employees. On January 15, 1945, the Board denied respondent's petition.

Respondent admits that on and after November 29, 1944, it refused to recognize and bargain collectively with the union, although it had theretofore been certified by the Board as the exclusive bargaining representative of respondent's employees, but contends that it was justified in refusing to bargain on the ground that the certification was invalid.

■ It is the claim of respondent that the Board's certification of the union as the collective bargaining agent was invalid because the Board improperly delegated to the employees themselves the determination of what should be the appropriate unit. In support of its contention, respondent relies upon the case of Marshall Field & Co. v. National Labor Relations Board, 7 Cir., 135 F.2d 391, where the court refused to enforce the Board's order on the ground that it had left the selection of the bargaining unit to the employees in violation of the statute.* In arriving at its determination, the court observed that an election as to what bargaining agent was desired by the employees had been held in seven different groups; that from the fact that three groups selected one union as their representative, and three groups, a different one, the Board designated the three groups voting for one union as one appropriate

---

\* "The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." 29 U.S.C.A. § 159 (b).

unit for bargaining, and the three groups voting for the other, as another appropriate unit. The court held that the Board should have decided upon the unit or units appropriate for collective bargaining before holding the election, and that the subsequent designation of units by the Board, predicated upon employee elections, was illegal. An emphatic and forceful dissenting opinion was rendered by Judge Minton (now Mr. Justice Minton), in which he declared that nothing in the statute warranted the court in saying that an election could not be held until a unit had been designated and that the Board's procedure in making tentative findings as to what might be an appropriate unit, and then seeking the employees' preference thereto, was proper. He further observed that the Board had made tentative findings that certain groups might be considered as appropriate units for collective bargaining, and that, having made that determination tentatively, it sought the views of the employees in those groups by means of an election; that the Board never submitted to the employees the question of what was to be the bargaining unit, but only advised with them to determine whom the employees would have as bargaining representative in the unit tentatively determined by the Board to be appropriate; that there was no delegation of the Board's power to the employees, but that the election procedure followed was only a method of consultation with the employees not prohibitive by statute. The reasoning of the dissenting opinion seems persuasive. The facts in the instant case are, however, somewhat different from those in the Marshall Field case. Here, the Board definitely found that both the unit proposed by the union and the unit proposed by the respondent were appropriate for collective bargaining. There was nothing tentative about this finding. However, because the employees in both groups had a community of interest, the Board decided to determine from the employees themselves whether they desired the same representative for collective bargaining and notified them in advance what it had determined upon for an eventuality. At the same time, the Board carefully preserved the rights of the employees as members of each unit by having each unit decide separately what it desired. The wishes of the employees are a factor in a Board's conclusion upon a unit; they are to be weighed with the similarity of working duties and conditions, the character of the various plants, and the anticipated effectiveness of the unit in maintaining industrial peace through collective bargaining. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251. In this case, after considering all of the circumstances of the situation with reference to whether there should be one or two units selected as the appropriate collective bargaining agency, the Board came to the conclusion that the single factor that would tip the scales was the preference of the employees. The Board's determination, based upon the expression of the employees' practically unanimous preference, can not be said to be improper and invalid. The union was properly certified by the Board as the collective bargaining agent and, accordingly, respondent's refusal to bargain with the union was a violation of Section 8(5) of the National Labor Relations Act, 29 U.S.C.A. § 158(5).

■ Respondent's further contention that the election determining the collective bargaining agent was invalid because two of its supervisory employees had engaged in pro-union activities among the other employees is without merit. It is doubtful whether an employer may complain of the activities of its supervisory employees in this regard. Such activities have been held unfair labor practices on the complaint of a union on the theory that the supervisory employees act with the authority or knowledge of the employer, and that any anti-union activity on their part may be, therefore, attributable to the employer. But the respondent's contention advanced on this point can not be sustained for a different reason. The only activity charged against Bowser, one of the supervisory employees in question, is that he told Griffin, the other supervisory employee, that he would have to join the union. This was two months before the election, and was an isolated occurrence. No other union

**122**

activity of Bowser appears in the case. As to Griffin, his vote was never counted, having been challenged by respondent. Griffin himself considered that he had no supervisory status, and all of the other employees also mistakenly assumed that he was not a supervisor. The Board found that the activities of these two supervisory employees did not influence any of the employees in their voting in the election, and this finding is supported by substantial evidence. With regard to wrongful interference with its employees, and unlawful discharge, the Board's findings that the employees, Murphy, Skaanning, and Donnelly, were unlawfully discriminated against and discharged in violation of Sections 8(1), 8(3), and 8(4) of the Act, 29 U.S.C.A. § 158(1, 3, 4), are, likewise, sustained by substantial evidence.

In accordance with the foregoing, a decree of enforcement of the Board's orders will be entered.