**NATIONAL LABOR RELATIONS BOARD v. LOCAL 404, INTERNATIONAL BROTH-ERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, A. F. L.**

No. 4719.

United States Court of Appeals
First Circuit.

June 10, 1953.

Samuel M. Singer, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and James A. Ryan, Washington, D. C., on brief), for petitioner.

Raymond T. King, Springfield, Mass. (Ely, King, Kingsbury & Lyman, Springfield, Mass., on brief), for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Brown Equipment & Manufacturing Co., Inc.—hereinafter called the Brown Co.—is a North Carolina corporation engaged in manufacturing, servicing and repairing various kinds of trucks and trailers. It has been in the middle of a dispute between two unions, both affiliated with the American Federation of Labor. The National Labor Relations Act, 29 U.S.C.A. § 151 et seq. supplies administrative machinery for ascertaining the employer's duty with respect to recognition and bargaining, when such a question as to representation arises. Without awaiting determination of the matter by the Board, the Brown Co., under pressure from one of the unions, informed its employees that they would have to join this union in order to retain their employment. In so doing, the Brown Co. probably committed an unfair labor practice, but this case is not concerned with that, since no charge was made against the Company, and the Board's complaint named only one of the unions as respondent. The rival unions each had some color of right in their respective claims, which each no doubt pursued in good faith. The question now before us, whether the Board's order against the respondent Union should be enforced, must be decided strictly as a matter of law, with no moral overtones.

The Brown Co. has several plants in the eastern part of the United States. They are all covered by a master contract between the Company and the International Association of Machinists, AFL. However, since 1945 the plant of the Brown Co. at West Springfield, Massachusetts, has been organized by International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL. This exception to the otherwise all-inclusive coverage of the Machinists' master contract was explicitly recognized in a letter from the Machinists to the Company dated July 23, 1945, which letter assured the Company that it could, without objection from the Machinists, continue to recognize the Teamsters pursuant to contracts already signed with them, at least until the jurisdictional dispute between the Machinists and the Teamsters was finally ironed out within the AFL organization. The Teamsters' West Springfield contract has been renewed from year to year, and until 1950 no controversy arose with respect to it.

The present dispute came about in the following way:

In 1949 an increased work load at the Brown Co.'s West Springfield plant—largely as a result of orders from the U. S. Army—created overcrowded working conditions there. By the fall of 1950 the Company found it absolutely essential to expand its physical facilities, and after some search in the Springfield area it rented a plant known as the Bradley Field plant, located in Windsor Locks, Connecticut, about 13 miles from West Springfield. The lease ran for one year and was renewable. According to

the testimony of the Company officers, however, the continued operation of the Bradley Field plant was wholly dependent upon the renewal of the Army contracts, which were subject to quarterly extension; if these contracts were discontinued the plant would be closed.

The Bradley Field plant opened on October 2, 1950, with approximately 65 employees. Prior to that time there had been some discussion as to which union would represent the employees there. At first, the Company had apparently taken the position that the master contract with the IAM would automatically cover the new plant, and it informally notified the Machinists of this fact. At some later point, however, it was persuaded that because of the close relationship between the two plants the contract with the Teamsters, which by its terms covered "the Employer's plant at West Springfield, Massachusetts, and adjacent area," also applied to the Bradley Field plant. Consequently when the latter plant was opened, the Teamsters, with the Company's consent, posted on the bulletin board a copy of the Springfield contract, notifying the employees at the new plant that this contract would cover them. And since the Springfield contract contained a union shop clause which had been duly authorized by the employees in the Springfield plant, the Teamsters further advised the employees in the Bradley Field plant that they would have to become members of the Union within 30 days in order to retain their employment.

In the meantime the Machinists had become concerned over these activities. They notified the Company that, in light of its master contract with the Machinists, it was acting improperly in recognizing the Teamsters at the new plant, and they also protested repeatedly that employees there were being coerced into joining the Teamsters. However, the Company did not change its position.

The Machinists then began to organize the employees at the Bradley Field plant, and on October 23, 1950, filed a representation petition with the National Labor Relations Board, claiming to represent a majority of the employees at that plant and re- questing that an election be conducted by the Board.

Nevertheless the Teamsters and the Company, firm in their conviction that the Bradley Field plant, regarded by them as merely a temporary expansion of the West Springfield plant, was covered by the Springfield contract, ignored these moves on behalf of the Machinists. When the 1949 Springfield contract expired on October 31, 1950, the Teamsters and the Company negotiated a new contract, this time explicitly making it applicable to both the West Springfield and the Bradley Field plants, notwithstanding the pendency of the representation proceeding. And when, apparently as a result of the Machinists' organizing activities, a large number of the employees at the Bradley Field plant refused to heed the Teamsters' aforesaid union shop notice, some workers were told by a representative of the Teamsters to "join up or else". Finally on December 1 the Teamsters created a work stoppage in the West Springfield plant designed to compel the Company to honor its contract by forcing the recalcitrant employees at the Bradley Field plant to join up with the Teamsters. On December 6 the Company called a meeting of the employees in the Bradley Field plant, at which occasion various Company officials told the workers that, in view of the applicable contract with the Teamsters including the union shop provision, the workers would have to join the Teamsters' Union if they wanted to retain their jobs. Between 30 and 40 employees who had not joined previously then signed up "under protest". The remaining seven employees joined shortly thereafter when they were advised to do so "under protest" by the Machinists' representative.

On December 8 the Board heard the representation case presented by the Machinists' petition, and on April 9, 1951, the Board announced its decision. It pointed out that since the geographical and organizational relationships between the two plants viewed by themselves might make it appropriate to designate either an independent unit at Bradley Field or a more inclusive unit embracing both the West Springfield and the Bradley Field plants,

and since there was no previous history of bargaining at the Bradley Field plant, the Board would fix the unit in accordance with the choice of the employees at Bradley Field, as ascertained in an election. Consequently an election was held there on April 30 which the Machinists won 30 to 12.

After the Machinists were certified on May 8 as the bargaining representative for the Bradley Field plant the Company negotiated a contract with them, and the Teamsters made no further efforts to organize the employees or to solicit dues from them. Indeed by the time the pending unfair labor practice charge against the Teamsters came on for hearing before the trial examiner,[1] only four employees remained at the Bradley Field plant, and now the plant appears to be entirely closed. Consequently the sole practical effect of the order which the Board issued against the respondent Teamsters' Union was to make it refund to those 31 employees, who the Board found had joined "under protest", all initiation fees and dues which the Teamsters had collected from them. It is the propriety of this order which we are here called on to review.

The trial examiner and the Board, on the basis of the foregoing facts, found that respondent had violated § 8(b)(2) of the Act by causing the Company to discriminate against its Bradley Field employees in applying the 1949 and 1950 contracts to them and requiring them to become members of the Union in order to retain their employment without a union shop election having first been conducted in the Bradley Field plant; also that respondent violated § 8(b)(1)(A) by restraining or coercing employees in their rights under § 7, viz., to

join labor organizations of their own choosing or to refrain therefrom altogether. There can be no serious doubt that factually these findings were fully warranted by the record.[2]

The only substantial defense sought to be raised by respondent is that somehow these prima facie unlawful actions were justified by a bona fide belief on its part that the 1949 contract, which applied to West Springfield "and adjacent area," covered the Bradley Field plant. Thus it is argued that the Board's subsequent decision that the Bradley Field plant might constitute a separate appropriate unit and the choosing of the Machinists at the Bradley Field election pursuant thereto could not serve retroactively to make unlawful respondent's earlier good faith conduct.[3]

We are not persuaded by this argument. It is true, of course, that respondent, by dint of the phrase in the 1949 contract and the close relationship between the two plants, had some colorable claim to the right of representing the Bradley Field employees; and to this extent the problem differs somewhat from the situation where two rival unions are trying to organize a new plant and one union attempts to compel the employer to recognize it without making a proper majority showing. But the Machinists as a result of their master contract with the Brown Co. certainly had a plausible claim also, and the fact that the Bradley Field plant was located 13 miles away from the West Springfield plant, in another city and state, gave further strength to the Machinists' case.

■ It may be true also that if the Board had ultimately found the Bradley Field unit inappropriate, or perhaps also if the Board had found that separate unit appropriate,

1. The original unfair labor practice charge was filed by the Machinists on January 9, 1951, and was amended first on June 4, 1951, and again on June 21, 1951.

2. See the foregoing recital of undisputed facts.
   It may at first appear that it was the Company rather than the Teamsters' Union which was primarily responsible for the pressure put upon the Bradley Field employees. But while the Company

probably also committed an unfair labor practice, no charges were filed against it. And in view of the "join up or else" threats as well as the sit-down strike in the Springfield plant, there can be little doubt that the Teamsters were the principal instigators of the pressure put upon the Bradley Field employees.

3. There is no dispute that once the Machinists had been chosen and certified the Teamsters abided by this decision and ceased all previous activities.

but the employees therein had chosen the Teamsters, respondent's earlier conduct would have been legitimized. But this in itself presents no unique situation. The point is simply, as the trial examiner put it, that respondent was acting at its peril when it sought to compel the employer and the employees to accept it as the Bradley Field bargaining representative in the face of the competing organizational activities by the Machinists. A question of representation was raised by the rival claims of the Teamsters and the Machinists, and this question was solely for the Board to determine.

█ The Teamsters' argument that its action was wholly lawful until it was *decertified* by the Board merely begs the question; for this assumes that the Teamsters were the representative of the Bradley Field employees, as provided in § 9(a) of the Act, a question which the Board first had to determine. In this connection, respondent can scarcely take refuge in the "adjacent area" clause in the contract since (1) it is certainly not clear that this clause definitely covered the instant situation; (2) in any event the question of the right of representation as between two competing labor organizations is one involving public interests committed by Congress to the National Labor Relations Board and cannot be contractually settled by the parties; (3) even assuming the 1949 contract covered the Bradley Field plant, this contract expired on October 31, 1950, and the negotiation of the new contract, which explicitly included the Bradley Field employees, was certainly improper in view of the rival claim by the Machinists as presented in the representation petition.

█ Respondent also contends that the Board's decision in the representation case was clearly erroneous in that (1) the Bradley Field plant could not constitute an appropriate unit, and (2) the Board was not justified in leaving the ultimate decision up to the employees themselves. The first argument seems clearly frivolous. Certainly the Board did not exceed its permissible discretion when, after weighing the geographical and organizational relationships between the two plants and taking into ac-

count the fact that there had been no history of joint bargaining for the two plants, it concluded that either unit might be appropriate. The Board's opinion in this connection (93 N.L.R.B. 1278) effectively disposes of respondent's objection. With respect to the second point, respondent relies heavily on Marshall Field & Co. v. N. L. R. B., 7 Cir., 1943, 135 F.2d 391. The Board, on the other hand, points to the later case in this circuit of N. L. R. B. v. Underwood Machinery Co., 1 Cir., 1949, 179 F.2d 118. In the Underwood case we expressed our doubts as to the correctness of the majority decision in the Marshall Field case, but found it to be distinguishable. The present situation is much closer to the facts of the Underwood case. The Board here did not leave the decision completely up to the employees; rather it weighed the various factors which it should take into account and understandably concluded that more than one unit might be appropriate. That being so, the Board quite properly "came to the conclusion that the single factor that would tip the scales was the preference of the employees." 179 F.2d at page 121.

As has been previously noted, since the Bradley Field plant is now completely closed, the sole issue involved here is whether the Teamsters must refund to the named 31 employees their initiation fees and dues which had been paid under protest. With respect to this, respondent raises two further objections: (1) That there was insufficient evidence that the 31 employees had joined under protest, and (2) that it was inappropriate for the Board to order these sums to be refunded in view of the fact that the Teamsters, while acting as their bargaining representative, had secured a raise for them, prosecuted their grievances, and in all other respects diligently represented their interests.

█ The Board's finding that the 31 employees joined under protest seems to have been clearly proper. The Machinists in their second amended charge of June 21, 1951, appended a list of 35 names of employees who it claimed had been compelled to join the Teamsters. It was stipulated by the parties that the testimony of Charles D. Lowery, Jr., one of these 35, would apply

104

as to all but six named employees. Lowery stated that he joined under protest. As to the remaining six, two testified that they joined under similar circumstances. The four others did not testify. Hence the Board was clearly authorized in finding that all but four of the named employees (i. e., 31) had joined involuntarily.

█ The Board's power to direct a refund of initiation fees and dues as an incident of its general statutory authority to order " 'such affirmative action * * * as will effectuate the policies of this Act'" was explicitly recognized by the Supreme Court in Virginia Electric & Power Co. v. N. L. R. B., 1943, 319 U.S. 533, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568. There, too, the argument that if the employees, though having joined under coercion, received any value for their dues payments in the form of services rendered for them by the union, a refund of the dues could not be ordered, was summarily rejected by the Court. 319 U.S. at pages 543–544, 63 S.Ct. 1214.

A decree will be entered enforcing the order of the Board.