**HAMILTON TEST SYSTEMS, NEW YORK, INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**and**

**Local 804, Delivery and Warehouse Employees, An Affiliate of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenor.**

**Nos. 1365, 1522, Dockets 84–4044, 84–4056.**

United States Court of Appeals, Second Circuit.

Argued June 21, 1984.

Decided Aug. 30, 1984.

Edward J. Dempsey, Hartford, Conn. (Joseph C. Wells, Farmer, Wells, Sibal & Dempsey, Hartford, Conn., of counsel), for

petitioner Hamilton Test Systems, New York, Inc.

Ralph C. Simpson, N.L.R.B., Washington, D.C. (Wilford W. Johansen, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, William Wachter, N.L.R.B., Washington, D.C., of counsel), for respondent N.L.R.B.

Richard M. Seltzer, New York City (Cohen, Weiss & Simon, New York City, of counsel), for intervenor Local 804, Delivery and Warehouse Employees.

Before MESKILL, CARDAMONE, and ROSENN,* Circuit Judges.

ROSENN, Senior Circuit Judge.

Hamilton Test Systems, New York, Inc. (Company) petitions for review of a decision and order of the National Labor Relations Board (Board) holding that the Company committed an unfair labor practice by refusing to bargain with Local 804, Delivery and Warehouse Employees (Union). The Board cross-petitions for enforcement. The Company contends that its refusal to bargain was justified because the Board certified an inappropriate bargaining unit and because the Regional Director conducted the representation election pursuant to an official notice that incorrectly defined the bargaining unit. We see no error in the Board's unit determination. We grant the Company's petition for review, however, because the Board's election procedures effectively denied the employees in these proceedings an opportunity to vote

for representation in the unit certified by the Board.

## I

Hamilton Test Systems, New York, Inc. services computerized automobile emission test machines under a contract with the State of New York. The Company's operations are divided between its headquarters in Hauppauge, New York, and three district offices.[1] Each of the facilities employs field service representatives and customer service supervisors, in addition to clerical workers, business employees, and supervisors. The headquarters also employs technicians, crib attendants, and a truck driver.[2]

Fourteen field service representatives work out of each of the branch offices and fifteen out of the Hauppauge headquarters. The field service representatives visit the automobile inspection stations and perform preventive maintenance checkups on the Company's equipment. They also make minor repairs with spare parts that they carry with them. Defective parts are returned to the local district office for delivery to Hauppauge where the technicians make in-shop repairs to them. The field service representatives carry beepers to enable them to respond to emergency customer calls for repair assistance, and they are provided with company automobiles. They may also use the automobiles for personal purposes at the rate of ten cents per mile. They report to their respective offices only once a week to turn in their records, exchange parts, and meet with other representatives.

* Honorable Max Rosenn, United States Circuit Judge for the Third Circuit, sitting by designation.

1. The district offices are located in Williston Park, Yonkers, and Brooklyn, New York, each at distances varying between twenty and fifty miles from the headquarters.

2. The following classifications of employees work at these facilities:
    At Hauppauge, New York
       15 field service representatives
       2 customer service supervisors
       9 technicians and 1 junior technician
       3 crib attendants
       1 truck driver
    At Williston Park, New York
       14 field service representatives
       2 customer service supervisors
    At Brooklyn, New York
       14 field service representatives
       2 customer service supervisors
    At Yonkers, New York
       14 field service representatives
       2 customer service supervisors

Each of the facilities also has two customer service supervisors.[3] These employees receive calls for repairs and dispatch field service representatives to attend to customer problems. The customer service supervisors also replace defective parts that the field service representatives bring in from their equipment inspections. The customer service supervisors work out of their own crib of parts, which is restocked by the Company's truck driver.

The technicians' job is to repair the defective emissions machine parts brought in by the field service representatives. The technicians work in the Hauppauge facility in an open area across from the crib attendants. The technicians receive the defective parts from the crib attendants and return them when the repairs are completed. Unlike field service representatives with whom they have little or no contact, the technicians are not required to have experience in the automotive industry.

The crib attendants are responsible for handling and issuing parts, keeping a record of them, and maintaining the main parts crib at the Hauppauge facility. The main parts crib is adjacent to the technicians' workplace and is separated from the · customer service supervisors' crib by a wire cage.

The truck driver delivers new and repaired parts to the district offices and picks up defective parts at these offices for repair at Hauppauge. The truck driver also occasionally delivers whole machines directly to customers. The truck driver reports for work to the Hauppauge headquarters in the morning and checks out there in the evening.

## II

On January 20, 1982, Local 804, Delivery and Warehouse Employees filed a petition with the National Labor Relations Board seeking certification as a bargaining representative. The Regional Director decided on May 28 that the appropriate unit for bargaining would consist of the five groups of non-clerical employees at the Hauppauge facility. *See supra* note 2.[4] The Company sought Board review of the Regional Director's decision, maintaining that the appropriate bargaining unit consisted of the service and repair employees at all four facilities. The Union also requested review contending that the appropriate bargaining unit comprised the technicians, crib attendants, and the truck driver at the Hauppauge facility, but not the field representatives or the customer service supervisors. An election was set for June 25, 1982. On June 24, the Board telephoned the Regional Director and informed him that it was denying the Company's request for review of his designation of the bargaining unit and granting the Union's request. The parties were advised of this action later that afternoon. The Board confirmed its decision by mailgram the next day.

On June 25, the Regional Director conducted an election among the employees in the unit that he had initially designated. The ballots were impounded pending the Board's ultimate ruling on the scope of the bargaining unit. On December 2, the Board issued its decision rejecting the Regional Director's unit determination and establishing the smaller group requested by the Union as the bargaining unit. The ballots cast by the smaller unit were counted. Six voted in favor of and four voted against union representation.

On December 17, the Company filed objections to the conduct of the election. The Regional Director overruled the objections

---

**3.** The Board found, and it is undisputed, that the customer service supervisors are not supervisors within the meaning of section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11) (1982).

**4.** The Regional Director described the unit in the election notice as follows:

INCLUDED:

All full-time and regular part-time crib attendants, truck-drivers, technicians, field service representatives, and field service supervisors, employed by the Employer at its facility ... in Hauppauge, New York ....

EXCLUDED:

All other employees, office clerical employees, bookkeepers, secretaries, accountants, guards, and supervisors as defined in the Act.

in their entirety. To obtain review, the Company refused to bargain with the Union. The Union thereupon filed an unfair labor practice charge and the Regional Director issued a complaint based on the charge. The Company answered by denying the appropriateness of the unit and the validity of the Board's certification of the Union. The Board granted the General Counsel's request for summary judgment. The Company then petitioned this court for review of the Board's decision and order, and the Board cross-applied for enforcement.

## III

The Company contends that the Board erred in rejecting the Regional Director's unit determination and establishing the smaller bargaining unit. The Company urges that the Board's determination be overturned because the Company operates an integrated, technical enterprise that should not be carved up by piecemeal unionization. It stresses that field representatives and technicians receive virtually the same wages, require similar expertise, and receive a one-week training program. Further, during one crunch period, field representatives were called in to assist the technicians. The Company also argues that the truck driver is on the road as much as any field representative. It cites the Regional Director's findings that the field service representatives and technicians perform substantially the same type of work and utilize the same skills and training: "The field service representatives and [customer] service supervisors to the Hauppauge facility share a community of interest with the technicians, crib attendants, and truck-drivers and should be included in the same unit."

The Board, however, reached its unit determination after comparing wages, supervision, training, advancement possibilities, and employee interaction. Thus, the Board examined appropriate factors in making its decision. *See NLRB v. Bay Shipbuilding Corp.*, 721 F.2d 187, 190–91 (7th Cir.1983). The Board found that the community of interest between the field service representatives and the customer service supervisors contrasted with the community of interest of the technicians, crib attendants, and truck driver:

> In contrast, the field service representatives spend only 3 hours per week at the Employer's facility, and the customer service supervisors are located in an enclosed office separate from the other employees. In addition, the field service representatives and the customer service supervisors are separately supervised, have no interchange with the other employees, and have a separate promotional ladder. Moreover, the customer service supervisors receive significantly higher wages than other employees, and the field service representatives alone receive the benefit of a company car. Further, there are different job qualifications for field service representatives than for technicians, and the field service representatives service whole machines rather than repair individual parts, thereby making it necessary for them to receive separate training from the technicians after the initial training session.

*Hamilton Test Systems, New York, Inc.*, 265 N.L.R.B. 595, 596 (1982).

The Company does not challenge the accuracy of the Board's factual findings. As noted by the Supreme Court, "the selection of an appropriate bargaining unit lies largely within the discretion of the Board." *South Prairie Construction Co. v. Local 627, International Union of Operating Engineers*, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976) (per curiam). The Board's determinations will not be disturbed unless found to be arbitrary. *NLRB v. J.W. Mays, Inc.*, 675 F.2d 442, 443 (2d Cir.1982) (per curiam). The Company also acknowledges the narrow scope of review of an NLRB unit determination. *See Mercy Hospital v. NLRB*, 730 F.2d 75, 77, 78 (2d Cir.1984). To uphold the Board's determination, "[t]he bargaining unit approved by the Board need not be the *most* appropriate unit, only *an* appropriate unit." *NLRB v. Hudson River Aggregates, Inc.*, 639 F.2d 865, 871 (2d Cir.1981). Based on the Board's factual findings, we conclude that the unit selected by the

Board is an appropriate unit. Therefore, we will not overturn the Board's unit determination.[5]

## IV

The Company also challenges the Board's certification of the Union following an election in which the Regional Director had informed the voters that they were electing a representative for a larger unit. The Company maintains that the outcome of the election might have been different had the employees known the scope of the unit.

The Board asserts that the Company should have raised its objection prior to the election. The Company had no basis for a complaint, however, until the Board decided to overturn the Regional Director's determination. There was nothing wrong with the conduct of the election at the time it was held. The problem arose when the Board, months after the voting was completed, decided to reshape the bargaining unit presented to the voters.

The Board also argues that the procedures followed were consistent with established Board policy. In 1976, the Chairman's Task Force on the National Labor Relations Board recommended that when there are pre-election challenges to determinations by a regional director, "the Board develop procedures for holding elections on the designated date and impounding the ballots for later counting...." Chairman's Task Force on the NLRB, Interim Report and Recommendations 13 (1976) (unpublished report) [hereinafter cited as Task Force Report]. Following the Task Force Report, the Board promulgated the following regulation:

> The filing of ... a request [for review of a regional director's decision] shall not,

unless otherwise authorized by the Board, operate as a stay of the election or any other action taken or directed by the regional director: *Provided, however,* That if a pending request for review has not been ruled upon or has been granted ballots whose validity might be affected by the final Board decision shall be segregated in an appropriate manner, and all ballots shall be impounded and remain unopened pending such decision.

29 C.F.R. § 102.67(b) (1983). The Board contends that its actions in this case were mandated by the Task Force report and the subsequent regulation. We disagree.

The regulation merely states that a challenge to a decision by the regional director should not serve as a stay of a representation election. A major purpose of this rule is to eliminate meritless appeals that are filed merely to delay the date of an election. Challenges to a regional director's eligibility determination frequently involve only the inclusion or exclusion of a few voters and, even if successful, may not change significantly the scope of the unit.

We do not believe that the regulation provides the Board with the authority to inform employees that they are voting for representation in a broad facility-wide unit and later to consider the ballot as a vote for representation in a unit that is less than half the size and considerably different in character. In the ordinary course of events, a unit determination is made first and the election follows. Under certain circumstances, the Board conducts "self-determination" elections that allow the employees to determine the unit. *See NLRB v. Underwood Machinery Co.,* 179 F.2d 118 (1st Cir.1949). In this case, however, the notice of election informed the employees that the election would be for a repre-

---

**5.** The Company also argues that its technicians and its field service representatives are "technical employees" and, as such, their division into separate units disregards the Board's policy of including all technical employees in the same bargaining unit. As used by the Board, "technical employee" is a term of art and refers to employees who perform work of a technical nature "involving the use of independent judgment and requiring the exercise of specialized

training usually acquired in colleges or technical schools or through special courses." *Litton Indus., Inc.,* 125 N.L.R.B. 722, 725 (1959). We do not believe that the duties of the technicians justify a finding that they are technical employees within the terms of the Board's policy. Furthermore, the Company did not raise this contention before the Board and is statutorily precluded from raising it before this court.

sentative in a unit of field service representatives, customer service supervisors, crib attendants, technicians, and truck drivers. Subsequent to the election, the Board decided to certify an exclusive bargaining agent for a different type of unit.

In support of its position, the Board points to the following statement of the Task Force:

The most troublesome problem would seem to center on a disputed issue of unit determination. But we are confident the Board could develop a balloting process under which the election could be held, whatever the eventual decision might be on the appropriate unit. An analogue is the *Globe* election . . . .

Task Force Report at 12.

The Task Force report, however, recommended that the Board "develop a balloting process under which the election could be held, whatever the eventual decision might be on the appropriate unit." *Id.* The Board in this instance could have informed the voters of the two possible bargaining units and had them cast two ballots, one for each unit, and could have impounded the ballots until it made its determination. The Board, however, failed to develop a process that, at the very least, would have informed the voters of the possible alternatives in the selection of the bargaining unit and would have permitted them to vote accordingly.

A change of one vote from union to non-union would have altered the outcome of the election. The Board insists that the employees' choice would not have been affected had they known the eventual scope of the bargaining unit. The realities of the workplace do not warrant such a conclusion.

There are several reasons why the employees might have voted differently had they known the true nature of the unit. First, the employees might have believed that the smaller bargaining unit would provide insufficient strength to justify union representation. Second, the unit consisted of the lower tier of employees in terms of pay and opportunities for advancement. The technicians might not have wished to have union representation in a unit with the lower paid crib attendants and the truck driver, segregated from the better paid and perhaps more attractive positions held by the field service representatives and customer service supervisors. Third, under the broader bargaining unit, a vote for the union would have maintained a unified work force. The Board's unit determination, however, split the work force. The employees might have believed that the representation by a union in only part of the facility could produce divisiveness and provoke undesirable tensions in the workplace. Fourth, interpersonal relationships within the plant might have made an individual employee comfortable with a facility-wide unit but caused concern and distress over leadership in a smaller unit.

In *ILGWU v. NLRB*, 339 F.2d 116 (2d Cir.1964), this court ruled, in an opinion by then Judge Thurgood Marshall, that the Board could not change the nature of the bargaining unit after an election: "[W]e cannot agree that the Board has the power to change the boundaries of a unit after the election. To do so would mislead the voter. . . ." *Id.* at 125. In concluding that the Board erred in altering the bargaining unit determination after the election, we do not question the Task Force's findings or the Board's regulations. We believe that the following statement in the Task Force's report is applicable to this case:

The Task Force realizes that, in a relatively few instances, the decision on the pending issues could result in a decision that no election [or a different election] should have been directed in the first place. . . . Obviously, it is an undesirable result if the parties have gone through with an election only to learn later that it was a nullity. But statistically such cases are sure to be a small minority of the total. On net balance, reducing the frustration of the statute and the parties in the great majority of cases clearly outweighs the unfortunate result in a few. This is simply one more example of the truism that no solution to a problem is likely to be perfect or all-encompassing.

Task Force Report at 13.

There are no facts in dispute in this case. The question is whether the Board erred in certifying the Union when the election held was for a bargaining representative in a unit composed of the five groups of workers. We recognize that the Board has broad discretion in its conduct of representation elections. We will not enforce an order of the Board, however, when the Board has effectively denied employees the right to make an informed choice in a representation election.

We conclude that the Board acted unreasonably in not affording the Company's employees an opportunity to vote for or to reject representation for collective bargaining purposes in a unit consisting only of technicians, crib attendants, and truck drivers. Accordingly, we grant the Company's petition for review and deny the Board's cross-petition for enforcement. The case is remanded to the Board for proceedings consistent with this opinion.