**NATIONAL LABOR RELATIONS BOARD**

v.

**NATIONAL CONTAINER CORP.**

No. 156, Docket 22839.

United States Court of Appeals,
Second Circuit.

Argued Feb. 10, 1954.

Decided March 10, 1954.

George J. Bott, David P. Findling, A. Norman Somers, Arnold Ordman and

Maurice Alexandre, Washington, D. C., for petitioner.

Davies, Hardy & Schenck, New York City, for respondent, Christopher W. Hoey, Richard J. Hickey and Quentin O. Young, New York City, of counsel.

Leo Greenfield, New York City, for intervenor, U. S. Corrugated Workers Union, Local No. 444, International Brotherhood of Pulp, Sulphite and Paper Mill Workers, A.F.L.

Before CHASE, Chief Judge, and AUGUSTUS N. HAND and MEDINA, Circuit Judges.

MEDINA, Circuit Judge.

For a number of years prior to 1949, the National Container Corporation,[1] hereinafter referred to as "National," had maintained contractual relations with Local 444, U. S. Corrugated Workers Union, affiliated with International Brotherhood of Pulp, Sulphite and Paper Mill Workers, A.F.L., hereinafter referred to as "Local 444."[2] Shortly before the end of that year, when the then current collective bargaining agreement between National and Local 444 was scheduled to expire, a group within Local 444, having become dissatisfied with the union leadership, formed a "Committee for a Real Union in National Container" for the purpose of electing new leaders in the local. Being unsuccessful in this objective, the group thereupon formed a rival union known as Independent Corrugated Workers Union of America, Local 1, hereinafter referred to as "Local 1."

On December 1, 1949, Local 1 advised National that it represented a majority of the employees, requested a conference for the purpose of negotiating a contract, and filed with the Board a petition for certification as the exclusive bargaining representative of National's production employees. On December 5, 1949, National refused to recognize Local 1. At the hearing on the petition for certification, Local 444 was permitted to intervene, and, on March 17, 1950, an agreement to hold a consent election was entered into by National, Local 1 and Local 444, to determine whether Local 1 or Local 444, or neither of them, was the collective bargaining representative of National's employees. This agreement was approved by the Regional Director on March 20, 1950. Thereafter, both unions waged an active election campaign, distributing leaflets and soliciting members and votes.

During the course of the election campaign, National on a number of occasions not only prohibited electioneering in the plant on behalf of Local 1 while at the same time permitting electioneering on behalf of Local 444, but also threatened its employees with economic reprisals if Local 1 won the election. Under National's rules, all persons other than employees were forbidden to enter the plant without official permission. Beginning about February, 1950, until the election on April 14, 1950, however, Kassie Gray and Reuben Moore, former employees of National then working at a neighboring plant and personal friends of "Scotty" Smith, an employee and president of Local 444, visited National's plant from one to four times a week during both the day and night shifts. Sometimes accompanied by Smith and on other occasions alone, they went through the plant and talked to most of the employees, urging them to vote for Local 444 and distributing pamphlets. On a few of these occasions, Gray and Moore had received permission to enter the plant, and, as was customary, had been given visitors' badges. More often, they entered without permission, and although supervisory officials saw them without badges, they were not restrained. On one of these occasions, in

1. National Container Corporation is a Delaware Corporation engaged in the manufacture and interstate sale of craft pulp, paper and corrugated boxes. It has admitted that it is engaged in interstate commerce within the meaning of the Act.

2. On October 5, 1953, this Court entered an order permitting Local 444 to intervene in this proceeding.

March, 1950, when Gray and Moore were distributing leaflets in the plant between seven and nine o'clock of the night shift, Douglas Fisher, a day shift employee and president of Local 1, was also in the plant. James Smith, "Scotty" Smith's brother and secretary-treasurer of Local 444, called Fisher's presence to the attention of a supervisor, who immediately ordered Fisher to leave. On the following day, Fisher was told by his foreman, Harry Roit, that he had heard of Fisher's presence in the plant the previous night and that company rules required day shift employees to punch out of the plant within a half hour of quitting time.

Another company rule prohibited employees from engaging in union activity during working time. Despite this rule, "Scotty" Smith and his brother James, president and secretary-treasurer of Local 444, respectively, frequently discussed union business and campaigned on behalf of Local 444 on company time without objection from company officials. In contrast, Wallace Irizarri, an employee and one of the leaders in the formation of Local 1 and later its president, was ordered by his foreman, William Chupa, to "stop talking to the other workers and talking about Local 1." On this occasion, Chupa also warned Irizarri that he "had better watch [his] step because if Local 444 won the election [he] would be out of a job." In addition, Chupa warned Irizarri's helper, Manuel Neives, that "if he listened to [Irizarri] he will be out of a job the same way [Irizarri] would."

On another occasion, "Scotty" Smith, president of Local 444, who had electioneered on company time without objection by National, demanded to know by what right Domingo Rivera, an employee, had signed a membership card for Local 1 and stated to him, "If I win the election you'll be out." And, on April 10, 1950, four days before the election, Kassie Gray, who had similarly electioneered in the plant on behalf of Local 444 without objection by National, told Victor Carrasquillo, an employee, that "You guys going to vote for Local 1 you are going to lose your jobs. If you vote for Local 1 you are going to get in trouble with the company." Gray added, "We have ways to find out the way you vote, and you will be in trouble with the company."

The election was held on April 14, 1950, and Local 444 received a majority of the ballots cast. On April 19, 1950, Local 1 filed objections to the election, alleging that the above described acts of interference and intimidation had affected the results of the election. On May 10, 1950, while these objections were being considered by the Board's Regional Office, National entered into a new collective bargaining agreement with Local 444. Accordingly, on June 5, 1950, Local 1 filed a charge alleging that National by its action had violated Sections 8 (a)(1) and (2) of the Act, 29 U.S.C.A. § 158(a)(1, 2).

After a hearing on Local 1's objections to the election and upon a second complaint [3] issued pursuant to the charge, the trial examiner on July 11, 1952, issued an Intermediate Report in which he found that, although National's conduct prior to the election constituted unlawful interference which would normally warrant setting aside the election, Local 1 had waived any rights accruing to it from such conduct since it did not file its objections until after the election had been held.[4] The trial examiner found further that since Local 1 was

3. The first complaint was withdrawn because at the time it was issued Local 1 was temporarily out of compliance with Section 9(f) and (g) of the Act, 29 U.S.C.A. § 159(f, g). The details of this withdrawal are considered in a subsequent part of this opinion.

4. The trial examiner relied on a number of prior decisions in which the Board had held that, where there was a genuine question of representation, and known coercive conduct occurred substantially in advance of the election, the failure of the losing union to protest this conduct before the election, either by filing unfair labor practice charges or by seeking postponement of the election, constituted "acquiescence" in or an implied waiver

precluded from relying on its objections to the election as a basis for setting that election aside, no real question concerning representation existed at the time National executed its contract with Local 444 on May 10, 1950. Accordingly, the trial examiner concluded that National did not violate the Act by entering into such contract and recommended that the complaint be dismissed.

The Board in its Decision and Order[5] agreed with and adopted the trial examiner's findings of fact. The Board found that National's pre-election "conduct interfered with the employees' freedom of choice in the selection of a bargaining representative" and agreed with the trial examiner's holding that National's pre-election conduct constituted such interference as would invalidate the election. However, for the reasons set forth in its decision in Great Atlantic & Pacific Tea Co., 101 NLRB 1118, the Board disagreed with the trial examiner's conclusion of law that Local 1's failure to file objections to that conduct prior to the election constituted a waiver of its right to file such objections thereafter and an acquiescence in the misconduct which occurred. Accordingly, the Board set aside the election and directed the Regional Director to conduct a new election at such time as he deemed appropriate. The Board further found that pending resolution by itself of Local 1's meritorious objections to the election, a question concerning representation still existed. The Board, therefore, concluded that National, by entering into a collective bargaining agreement with Local 444 at a time when the question concerning the proper representa-

tion of the employees was still unresolved, "contributed support to that organization in violation of Section 8(a)(2) of the Act, and interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act [29 U.S.C.A. § 157], thereby also violating Section 8(a)(1) of the Act."

As already stated, Local 1 filed its objections to the election on April 19, 1950, and filed its charge of unfair labor practices against National on June 5, 1950. A copy of the charge was served on National on June 8, 1950. On November 1, 1950, the Regional Director issued his Report on Objections in which he found that National, by interfering with the employees' free choice in the election, had engaged in conduct affecting the results of the election and recommended that a new election be ordered. Exceptions to this Report having been filed by National and by Local 444, the Board, on December 28, 1950, directed the consolidation of the representation and unfair labor practice cases and ordered a hearing thereon. Accordingly, a complaint and notice of hearing in the consolidated cases were issued on March 7, 1951, and a hearing was held.

The consolidated complaint, however, was apparently issued inadvertently, since Local 1, although previously in compliance with the filing requirements of Section 9(f), (g) and (h) of the Act, was partially out of compliance with Section 9(f) and (g) for the two week period from February 28, 1951 to March 14, 1951.[6] Accordingly, on June 27, 1951, the trial examiner issued his Intermediate Report in which he recom-

of the conduct as a ground for setting aside the election. See International Harvester Company, 93 NLRB No. 48; R. L. Polk & Co., 93 NLRB 1079; Denton Sleeping Garment Mills, Inc., 93 NLRB 329; Goodyear Tire & Rubber Company, 85 NLRB 135; E. I. DuPont de Nemours and Company, 81 NLRB 238; Greater New York Broadcasting Company, 85 NLRB 414; Henry C. Lytton & Company, 93 NLRB No. 49; Calvine Cotton Mills, Inc., 98 NLRB 843.

5. The Decision and Order of the Board is reported in 103 NLRB No. 138.
6. Local 1's two-week lapse in compliance involved only its failure to file financial and other similar data required by Section 9(f) and (g) of the Act. See N. L. R. B. v. Dant, 344 U.S. 375, 73 S.Ct. 375, 380, 97 L.Ed. 407, in which the Supreme Court pointed out that "As a practical matter, elections of new officers, changes in organizational structures, difficulties and delays in auditing

mended dismissal of the complaint because of Local 1's temporary lapse of compliance with the Act on the date of the issuance of the complaint. He further recommended that the objections to the election be dismissed because more than a year had elapsed since the date of the election.[7] Thereafter, on August 7, 1951, exceptions to the Intermediate Report were filed by Local 1.

On August 9, 1951, the General Counsel filed a petition for an order of the Board requiring National, Local 1 and Local 444, to show cause why the General Counsel should not be granted permission to withdraw the complaint "without prejudice to the General Counsel's right hereafter to issue a new complaint." On August 17, 1951, the Board issued a Notice to Show Cause affording all parties an opportunity to respond. On November 9, 1951, after having received responses from the parties, the Board issued a Decision on Motion granting the General Counsel leave to withdraw the complaint, but expressly reserving opinion on the question whether the General Counsel had, or should exercise, the power to issue a new complaint. Pending the General Counsel's final disposition of the charge, the Board deferred further action on the representation proceeding.

On January 14, 1952, Local 1 having remedied its lapse in compliance with the Act, the General Counsel issued a new complaint upon the original charge. On the same day, a Notice of Hearing on such complaint was issued, and copies of such Notice, complaint and charge were served upon National, Local 1 and Local 444. Answers to the complaint were filed by National and Local 444.

On March 24, 1952, the Board issued an Order directing that a hearing upon the objections to the election be held in conjunction with the hearing upon the complaint. On the same day, an Amended Notice of Hearing, further implementing the Order of March 24, 1952, was issued, and copies of the Order and the Amended Notice of Hearing were served on National and Local 444.

At the hearing, National challenged the General Counsel's authority to issue a new complaint based upon the original charge. The Board overruled this objection, holding that the "charge was not merged with or extinguished by the complaint originally issued," and, therefore, that "the charge survived the withdrawal of the first complaint on procedural grounds, and furnished the legal basis for the issuance of a new complaint by the General Counsel."

The Board ordered National to cease and desist from recognizing Local 444 as the bargaining representative of its production and maintenance employees and from giving effect to its contract of May 10, 1950, with Local 444, unless and until that union shall have been certified by the Board, and from in any like manner interfering with, restraining or coercing its employees. Affirmatively, the Board ordered National to withdraw recognition of Local 444 as the representative of its employees, unless and until it was certified by the Board, and to post the usual notices.

The ultimate substantive question in this case is whether National interfered with the organizational rights of its employees and contributed unlawful support to Local 444 by entering into a collective bargaining agreement with that

financial statements or in obtaining information with respect to the numerous details which § 9(f) and (g) requires, make compliance at a given moment, or continuous compliance, a matter of happenstance."

7. The Board's established policy in representation proceedings at that time was not to pass upon the merits of objections to an election in any case where more

than a year had elapsed since the election. In such cases, the Board dismissed the objections without prejudice to the immediate filing of a new petition. See Continental Southern Lines, Inc., 99 NLRB 247; W. C. Nabors, d/b/a W. C. Nabors Company, 89 NLRB 538; Barnhart Davis Company, 80 NLRB 977; Neptune Meter Company, 74 NLRB 390; F. A. Smith Manufacturing Co., Inc., 74

union after it had won an election conducted by the Board, but at a time when objections to the election filed by Local 1, a rival union, were pending before the Board. That question turns on whether such objections were meritorious, so that a real controversy concerning the representation of the employees was pending before the Board at the time National executed its collective bargaining agreement with Local 444. The case also presents the procedural issue of whether or not the General Counsel possessed the authority to issue a new complaint after he was granted leave to withdraw his original invalid complaint prior to a determination of the merits.

 The propriety of the Board's determination that the election should be set aside must be considered in the light of the principle that "Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 67 S.Ct. 324, 328, 91 L.Ed. 322. As long as the Board acts "so as to give effect to the principle of majority rule", N. L. R. B. v. A. J. Tower Co., supra, its determinations with respect to the details of the "election proceeding, and the * * * steps necessary to conduct that election fairly" are matters which Congress has entrusted to the Board alone. N. L. R. B. v. Waterman Steamship Corp., 309 U. S. 206, 60 S.Ct. 493, 503, 84 L.Ed. 704; N. L. R. B. v. National Plastic Products Co., 4 Cir., 175 F.2d 755. The considerations applicable in determining whether elections held under its auspices are conducted in a fair and free manner have been stated by the Board in General Shoe Corporation, 77 NLRB 124, as follows:

"An election can serve its true purpose only if the surrounding conditions enable employees to register a free and untrammeled choice for or against a bargaining representative. * * * When a record reveals conduct so glaring that it is almost certain to have impaired employees' freedom of choice, we have set an election aside and directed a new one. Because we cannot police the details surrounding every election, and because we believe that in the absence of excessive acts employees can be taken to have expressed their true convictions in the secrecy of the polling booth, the Board has exercised this power sparingly. The question is one of degree."

 We believe that the record in the case before us reveals such "glaring" and "excessive" conduct on the part of National. The Board's finding that National's conduct prior to the election interfered with the employees' freedom of choice in the selection of a bargaining representative and prevented a fair and free election is supported by substantial evidence on the record as a whole. It is thus apparent, as shown by the facts stated above, that by reason of the disparate electioneering privileges given to the two competing unions by National, by reason of National's threats to discharge its employees if they failed to vote for Local 444, and by reason of similar threats made by individuals who were given free access to the plant in order to electioneer on behalf of that local, a fair and free election was prevented.[8] The Board was correct in setting aside the election and directing the Regional Director to conduct a new election at such time as he deemed appropriate. Cf. Atlas Imperial Diesel Engine Co., 91 NLRB 530; Stern Brothers, 87 NLRB 16.

The Board decided the case of Great Atlantic & Pacific Tea Co., supra, on De-

NLRB 544; Desmond's Inc., 75 NLRB 1242; Edo Aircraft Corporation, 76 NLRB 447.

8. While there was some evidence that a few Local 1 adherents also engaged in electioneering on company time, and that on a few occasions Local 444 supporters were warned for such electioneering, the trial examiner concluded that on the whole National accorded Local 444 more favorable treatment.

cember 19, 1952, a full five months after the trial examiner's second Intermediate Report was issued on July 11, 1952. In its Decision and Order in the case before us, the Board held that where interference with the statutory right of employees to participate in a free and uncoerced election occurs after the execution of an agreement to hold a consent election but before the election, the Board will, for the reasons set forth in the Great Atlantic & Pacific Tea Co. case, no longer treat such interference as having been waived and will consider on the merits any objections to such interference, even though raised for the first time after the election. In applying the doctrine of the Great Atlantic & Pacific Tea Co. case, the Board overruled a number of prior Board decisions relied upon by the trial examiner in his second Intermediate Report.[9] Neither National nor Local 444 questions the propriety of the rule adopted by the Board in the Great Atlantic & Pacific Tea Co. case. Objection is raised, however, to the application of the rule in this case.

National contends that the facts of this case do not bring it within the rule of the Great Atlantic & Pacific Tea Co. decision, asserting that no finding was made that the interference occurred subsequent to March 17, 1950, the date of the execution of the consent election agreement (except for the Gray-Carrasquillo incident which occurred on April 10, 1950), and that in any event the record would not support such a finding. We do not think that this contention has any merit, as it ignores the fact that the Board made an explicit finding that the interference "took place after the execution of the Stipulation on March 17, 1950." The record amply supports this finding.

██ National points out that the disparate electioneering privileges on company time and property, which the Board found it accorded to Local 1 and Local 444, were actions of a continuing nature which began prior to March 17, 1950. National asserts that the waiver rule enunciated by the Board in the Great Atlantic & Pacific Tea Co. case cannot apply to interference of a continuing character, since otherwise a union could file appropriate objections even where the interference occurred prior to the date of the consent election agreement, namely, prior to the cut-off date provided for in the Board's own waiver rule. There is no merit to this contention made by National. The reason for the Board's adoption of this cut-off date is that a union which agrees to a consent election is deemed to have waived any prior interference. But such waiver can in no way constitute a license to the employer to continue such interference thereafter. Although the execution of the consent election agreement may have constituted a waiver by Local 1, the aggrieved union, of the prior interference, that union was entitled to assume that National would cease its interference after such agreement. In effect, National's contention amounts to a claim that the execution of the consent election agreement amounted to a waiver by Local 1 of future as well as past misconduct, and is too insubstantial to deserve serious consideration.

██ It is further contended that in the case before us the Board denied National due process of law by the retroactive application of the waiver rule enunciated in the Great Atlantic & Pacific Tea Co. case. It is claimed that if the Board had applied the waiver rule which was in effect at the time National recognized Local 444, and under which an aggrieved union was deemed to have waived its objections to known pre-election interference if such objections were not filed prior to the election, it could not have been established that a real question concerning representation existed and that recognition of Local 444 constituted unlawful assistance. It is accordingly asserted that the application of the Board's new waiver rule had the effect of retroactively converting into an unfair labor practice conduct which theretofore was entirely lawful.

---

9. See footnote 4, supra.

We do not think there is any merit in the contention that National and Local 444 have been prejudiced by a retroactive application of the rule laid down in the Great Atlantic & Pacific Tea Co. case. National's contention overlooks the fact that National continued its recognition of Local 444 after the Board adopted its new waiver rule in the Great Atlantic & Pacific Tea Co. case on December 19, 1952. Accordingly, even if National's conduct prior to the adoption of the Board's new waiver rule were immune from the impact of such rule, it is apparent that the rule also affected National's subsequent and continued recognition of Local 444, and, therefore, was not retroactive with respect to that conduct. N. L. R. B. v. Baltimore Transit Co., 4 Cir., 140 F.2d 51, certiorari denied 321 U.S. 795, 64 S.Ct. 848, 88 L.Ed. 1084. Similarly, the Board's order merely prohibits future action by National, namely, continued recognition of Local 444, and is thus prospective in operation. Contrary to National's claim, N. L. R. B. v. Guy F. Atkinson Co., 9 Cir., 195 F.2d 141, supports this position. In that case the Court, although refusing to enforce the reinstatement provisions of the Board's order on the ground that they were improperly retroactive in their operation, stated: "What we have said has no application to those portions of the order which operate prospectively, such as the order to cease and desist from recognizing Local 370, and from entering into any contract with it."

Moreover, National's claimed reliance on the old waiver rule is not supported by the record. The record shows that at a conference between National and Local 444 held after the filing of the objections to the election, National expressed doubts as to whether it could lawfully recognize Local 444, and that the motivating reason for such recognition was National's desire to avoid a strike threatened by Local 444. In addition, National, in its exceptions to the Regional Director's report on the objections to the election, filed several months after the contract with Local 444 was entered into, did not assert that the objections had been waived by Local 1, but merely contended that they were not supported by substantial evidence; and, instead of requesting a dismissal of the objections as being filed too late, National requested a hearing on the merits. Local 444 makes no claim that it relied on the Board's old waiver rule. In the absence of reliance upon such rule, neither National nor Local 444 can show prejudice by reason of the change in the rule.

Furthermore, even if it is assumed that National relied on the former waiver rule and that the new rule was applied retroactively, we are inclined to think that National's recognition of Local 444 was nevertheless unlawful. We believe that reliance upon a Board rule should not estop the Board from applying a new rule in an appropriate case, where its application will effectuate the purposes of the Act. Cf. N. L. R. B. v. Grace Co., 8 Cir., 184 F.2d 126, 129, in which the Court said: "The Board's [contract bar] rule * * * if applicable to the facts in this case, is a procedural rule which the Board in its discretion may apply or waive as the facts of a given case may demand in the interest of stability and fairness in collective bargaining agreements. The Board is not the slave of its rules." It is well settled that where, as here, an administrative agency in pursuance of its adjudicatory function makes an *ad hoc* change in one of its administrative policies, such change may be applied retroactively in an appropriate case. Securities and Exchange Comm. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995. The test is whether "the practical operation of the Board's change of policy * * * [will] work hardship upon respondent altogether out of proportion to the public ends to be accomplished." N. L. R. B. v. Guy F. Atkinson Co., supra [195 F.2d 149]; Securities and Exchange Comm. v. Chenery Corp., supra. The conclusion that reliance, if any, upon the old waiver rule should not estop the Board from apply-

ing its new rule is appropriate in a case where, as here, National and Local 444 undertook to resolve a question concerning representation, namely, whether the election was fair and free and hence whether the selection of one of two rival units constituted an uncoerced choice by the employees. Such a "question was solely for the Board to determine." N. L. R. B. v. Local 404, etc., 1 Cir., 205 F.2d 99, 103. It is incumbent upon the employer to maintain a strict neutrality when his employees are seeking to exercise their guaranteed right of freely choosing a bargaining representative. Section 7 of the Act; N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; F. W. Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658. Here, National, having violated such neutrality and usurped a Board function, may not complain that the Board cannot adopt a new approach in performing its statutory duties. By the same token, it was improper for Local 444, one of the rival unions seeking recognition, to resolve the question of whether or not objections to its own election should be dismissed. N. L. R. B. v. Local 404, etc., supra. Having nevertheless undertaken to answer that question, it may not complain concerning the Board's new approach. We think that where the contracting parties encroach upon the Board's prerogative, they act at their peril not only with respect to whether or not a real question concerning representation exists, but also with respect to the possibility that an existing Board rule may be changed. N. L. R. B. v. Local 404, etc., supra. National "had no legally cognizable right in any particular board * * * policy." Local Union No. 12 v. N. L. R. B., 7 Cir., 189 F.2d 1, 2. We believe, therefore, that the Board here properly applied the waiver rule laid down in the Great Atlantic & Pacific Tea Co. case and properly rejected National's and Local 444's contention that Local 1 "waived" its right to object to pre-election coercive conduct.

National also claims reliance upon another rule which it is asserted the Board reversed retroactively. As previously stated, the election herein was held on April 14, 1950, and more than one year later, on June 27, 1951, the trial examiner issued his first Intermediate Report, dismissing Local 1's objections to the election pursuant to the Board's then existing rule that it would not pass on the merits of objections to an election where more than one year had elapsed since that election. Thereafter, on October 18, 1951, the Board abandoned that rule in American Thread Company, 96 NLRB 956, overruling a number of prior Board decisions on which the trial examiner had relied in his first Intermediate Report.[10] Accordingly, the trial examiner considered Local 1's objections on their merits in his second Intermediate Report, this time dismissing them on the basis of the "acquiescence" doctrine.

There is no merit to National's contention that it "has been denied due process of law by the capricious, arbitrary and retroactive application of the American Thread case to the instant proceeding." When National recognized Local 444 on May 10, 1950, by entering into a new collective bargaining agreement with it, it obviously could not have known that the trial examiner's first Intermediate Report would be issued more than one year after the election. Accordingly, it is difficult for us to understand how National could have relied on that policy when it recognized Local 444, and hence how it has been prejudiced by the fact that the Board failed to apply its former policy in this case. Moreover, we believe that this contention is barred by Section 10(e) of the Act, 29 U.S.C.A. § 160(e), since it was at no time urged before the Board. N. L. R. B. v. Cheney Cal. Lumber Co., 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739; Marshall Field & Co. v. N. L. R. B., 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744.

The Board properly found that National contributed support to Local 444 in

10. See footnote 7, supra.

violation of Section 8(a) (2) and (1) of the Act. The record shows that on April 19, 1950, five days after the election, Local 1 filed its objections to the election, and that despite the pendency of these objections, National entered into a collective bargaining agreement with Local 444 on May 10, 1950. As its sole defense against the charge of violating Section 8(a) (2) and (1) of the Act, National contended, and the trial examiner held, that Local 1 had waived its right to insist upon National's conduct prior to the election as a ground for voiding the election, since it did not file its objections until after the election had been held; that, consequently, no real question concerning representation existed at the time National executed its contract with Local 444, and hence that such execution could not constitute an unfair labor practice. As we have already shown above, however, the Board held that Local 1 had not waived any rights accruing to it from National's pre-election conduct, even though it did not file its objections until after the election had been held, and that, consequently, "the question concerning representation herein had not been finally determined." Accordingly, the Board, applying the doctrine enunciated in Midwest Piping and Supply Co., Inc., 63 N.L.R.B. 1060, found that by entering into a collective bargaining agreement at a time when objections to the election, ultimately found to be meritorious, were still unresolved by the Board, National had "contributed support to [Local 444] in violation of Section 8(a) (2) of the Act, and interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act, thereby also violating Section 8(a) (1) of the Act."

Under the Board's Midwest Piping rule, as this Court pointed out in N. L. R. B. v. Electronics Equipment Co., Inc., 2 Cir., 194 F.2d 650, 652, it is "an unfair labor practice for an employer to recognize one of two unions as the exclusive bargaining agent during the pendency of the rival union's petition for certification, when (to quote the Board)

the employer then knew 'that there existed a real question concerning the representation of the employees.'" This rule is a direct outgrowth of the parent doctrine of employer neutrality in matters relating to employees' choice of a bargaining representative. It has long been established that where employees are confronted with a choice of bargaining representatives, the employer may not accord such treatment to one of the rivals as will give it an improper advantage or disadvantage in its contest for the employees' favor. N. L. R. B. v. Waterman Steamship Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704, N. L. R. B. v. Clark Bros. Co., Inc., 2 Cir., 163 F.2d 373. In the case before us, the question concerning representation was still pending because of the necessity for resolving the issue raised by Local 1's objections, which were ultimately sustained. Until this issue was resolved, namely, whether a free election had been held, the Board could not finally resolve the representation question, which it was its function under the Act to resolve. National, by entering into a collective bargaining agreement with Local 444 during this very period, wrongfully usurped this function, in effect decided for itself that Local 1's objections had no merit, and determined that recognition of Local 444 was appropriate. The finding of the Board that in so acting National violated the neutrality which the Act imposed upon it, in violation of Section 8(a) (1) of the Act, and contributed unlawful assistance to Local 444, in violation of Section 8(a) (2) of the Act, was clearly proper.

There is no merit to National's and Local 444's attack upon the authority of the General Counsel to issue a new complaint after his withdrawal of the original invalid complaint prior to a determination of the merits. As previously stated, the initial complaint herein was issued, apparently through inadvertence, at a time when Local 1 was temporarily not in compliance with Section 9(f) and (g) of the Act. As noted in N. L. R. B. v. Kobritz, 1 Cir., 201 F.2d

156, 157, such a situation is one where "the Board could have remedied the defect by vacating the complaint issued [originally] and issuing a new complaint after the union got back into compliance again." A contrary rule (under which invalidity of the complaint would also invalidate the charge) would have undesirable results, and would be contrary to the public interest, since it would frequently destroy all possibility of remedying violations which have been timely charged by permitting the interposition of a statutory limitations bar to the filing of a new charge. Thus, in the case before us, if the General Counsel had discovered the invalidity of the initial complaint immediately after its issuance on March 7, 1951, the rule advanced by National and Local 444 would prevent issuance of a new complaint upon the old charge, and the limitations proviso of Section 10(b) of the Act would bar the filing of a new charge. We do not think that Congress intended to place upon Section 10(b) of the Act an interpretation which would produce such mischievous results.

No sound reason has been advanced why a new complaint should not issue. It is argued that if a second complaint may be issued upon a single charge, the General Counsel will be able, whenever the trial examiner dismisses a complaint because of the insubstantiality of the evidence, to issue a new complaint in order to make a better record, and thus be in a position to relitigate cases *ad infinitum*. We think that this argument is speculative and has no bearing on the case before us. The issue presented here is not whether there is authority to issue a new complaint where the first *valid* complaint is dismissed because of lack of evidence, but whether such authority exists upon the dismissal of the first complaint which is *invalid* because of the charging union's non-compliance with Section 9(f) and (g) of the Act. Here, unlike the hypothetical situation posed, there was no determination of the merits of the violations alleged in the first complaint, and the second complaint was not used as a technique for making a better record. Moreover, all that was held in N. L. R. B. v. Atlanta Metallic Casket Co., 5 Cir., 205 F.2d 931, 935, relied upon by both National and Local 444, was that an amended complaint issued after the charging union had come into compliance did not constitute a new complaint and failed to cure the invalidity of the first complaint issued at a time when the charging union was not in compliance. The Atlanta case expressly left open the specific question presented to us for adjudication. Furthermore, the Court pointed out in that case that "the original complaint was never withdrawn," "no new notice of hearing as required for 'a complaint' under Section 10(b)" was issued, and there was "nothing otherwise to indicate that the Board itself intended thereby to initiate a new and independent proceeding." It seems to us that this language intimates that had the General Counsel intended, and manifested his intention, to issue a new and separate complaint, the propriety of that complaint might have been sustained. In the case before us, neither National nor Local 444 disputes the fact that these conditions were met. The original complaint was withdrawn; a new complaint and a new notice of hearing upon that complaint were issued and served upon National and Local 444; and an order redesignating the trial examiner to preside over the new hearing was issued.

National's contention that the entire record made at the hearing upon the first complaint was a nullity because of the invalidity of such complaint, and that the Board's order is invalid because it is based upon such record, is without merit. The evidence supporting the Board's order and finding that National violated Section 8(a) (2) and (1) of the Act (except for the execution of the collective bargaining agreement of May 10, 1950, which was conceded at the second hearing, and hence is not subject to the alleged infirmity) was adduced at the first hearing, a consolidated hearing on the complaint and on the objections to the election, for the purpose of

establishing the validity of such objections. It appears to us that the first hearing, in so far as it related to the objections to the election, was valid irrespective of the invalidity of the first complaint. Certainly, if the objections to the election had not been consolidated for hearing with the first complaint, and if the evidence relating to such objections had been taken at a separate hearing, such evidence would not have been affected by the invalidity of the first complaint. We can see no valid reason, and none has been suggested, why the consolidation of the representation and complaint cases for hearing precluded the Board from considering such evidence. Moreover, National's objection to the Board's consideration of the evidence adduced at the first hearing is barred by Section 10(e) of the Act, since it was not raised before the Board. N. L. R. B. v. Cheney California Lumber Co., supra; Marshall Field & Co. v. N. L. R. B., supra.

Local 444, in reliance upon Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 219, 83 L.Ed. 126, and upon the Board's rules and regulations, contends that it is a "person against whom [the] charge is made" within the meaning of Section 10(b) of the Act, and that the second complaint should be dismissed because a copy of the charge had not been served upon it within the six-month period provided in that section. We believe that Local 444's contention is unsound. Section 10(b) requires timely service of the charge only "upon the person against whom such charge is made". The Board correctly held that Local 444 was not charged with unfair labor practices, and, therefore, that it was not entitled to service of the charge within the six-month period. Neither the Consolidated Edison case, supra, nor the Board's rules and regulations require a different conclusion. That case arose under the Wagner Act, which contained no provision for service of the charge, and required only that the complaint be served upon the person charged with unfair labor practices. In refusing to enforce a provision of the Board's order requiring the employer to desist from giving effect to contracts with certain unions which had not been parties to the proceeding before the Board, the Supreme Court pointed out that since the contracting unions had "valuable and beneficial interests in the contracts", they "were entitled to notice and hearing before [the contracts] could be set aside." The court pointed out that copies of the complaint had not been served upon the contracting unions, "but upon one whose members were not employees of the companies' system"; that the contracting unions had not sought to intervene in the proceeding, since "neither the original complaint—which antedated the contracts—nor the subsequent amendments contained any mention of [the contracts]," and, consequently, the contracting unions "were not put upon notice that the validity of the contracts was under attack"; and that, therefore, the contracting unions had not had an opportunity to be heard. It is thus apparent that the Consolidated Edison case involved the issue of due process, and does not stand for the proposition that a contracting union like Local 444 is a person charged with an unfair labor practice within the meaning of Section 10(b) and entitled to service of the charge within the six-month period. In the case before us, both the charge and the complaint were served upon Local 444 before the hearing, giving it ample notice concerning the issues involved, and Local 444 participated fully at such hearing. Accordingly, Local 444 was in no way misled or prejudiced.

Finally, service of the charge upon Local 444 was in fact timely. National's unlawful recognition of Local 444 began on May 10, 1950, the date of their collective bargaining agreement. That agreement did not expire until December 31, 1951, well beyond March 7, 1951, the date upon which the charge was served upon Local 444. Accordingly, service of the charge was plainly

within the statutory period of limitation. Katz v. N. L. R. B., 9 Cir., 196 F.2d 411; N. L. R. B. v. F. H. McGraw & Co., 6 Cir., 206 F.2d 635.

The order of the Board will be enforced.