### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### TRI–CITY LINEN SUPPLY, Respondent.

No. 76–3755.

United States Court of Appeals, Ninth Circuit.

March 22, 1978.

Rehearing and Rehearing En Banc Denied July 24, 1978.

---

Bernard Jeweler (argued), Washington, D. C., for petitioner.

Ralph E. Wiggen (argued), Kenneth M. Fitzsimon, Los Angeles, Cal., for respondent.

Before KENNEDY and HUG, Circuit Judges, and JAMESON,* District Judge.

---

\* Honorable William J. Jameson, Senior District Judge for the District of Montana, sitting by designation.

1. The Board's decision and order is reported at 226 NLRB No. 98 (1976).

JAMESON, District Judge:

This case is before the court on the application of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), for enforcement of its order issued on November 1, 1976, against Tri-City Linen Company (Tri-City).[1] The Board found that Tri-City had violated Section 8(a)(5) and (1) of the Act by refusing to bargain with the certified collective bargaining representative of its employees.[2]

Finding that all issues raised in the unfair labor practice proceeding were or could have been raised in a prior representation proceeding, the Board granted the General Counsel's motion for summary judgment. Tri-City challenges the summary disposition of the case and contends that the Union was improperly certified as the collective bargaining agent of Tri-City's employees. We find substantial evidence in the record as a whole to support the Board's findings and conclude that summary judgment was proper.

### Factual Background

Tri-City is in the business of furnishing linen goods to restaurants and beauty parlors in the Riverside, California area. On May 23, 1975, the date of the election in question, Tri-City employed eight motor route drivers who performed pick up and delivery service to the firm's customers. Prior to the election, the drivers had no union representation.

On the morning of May 9, 1975, Frank Cifu, the sole proprietor of Tri-City, was contacted by Union business agent Henry Papke, to discuss the Union's desire to organize Tri-City's route drivers. Cifu refused to talk to Papke. Later that morning, Cifu called a meeting of his drivers,[3] at which he made certain statements regard-

---

2. Sales Drivers and Dairy Employees Local 166, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

3. The meeting was attended by all but one of the drivers; the absent driver was not at work due to illness.

ing what would happen if his employees elected to organize.[4] Cifu also polled his employees to determine their sentiment toward the Union.[5]

On the same day, the Union filed a representation petition with the Board seeking certification as the bargaining representative of Tri-City's drivers. The parties executed a Stipulation for Certification upon Consent Election and waived a hearing on the bargaining unit. The Board set May 23, 1975 as the election date.

On May 19, the Union filed an unfair labor practice charge against Tri-City, based on Cifu's conduct during the May 9 meeting with his employees. The Union also filed a request to proceed with the election. Cifu received notice of the charge by mail and immediately contacted Board Agent Stephen Harris, who was named in the letter of notice as the agent in charge of the investigation. Cifu told Harris that he was unschooled in labor law and asked Harris for advice. Harris advised Cifu to contact a labor lawyer and to refrain from discussing Union matters with his employees until he was represented by competent counsel.

On May 22, Papke called a meeting of Tri-City's drivers to discuss Union wages and benefits. Seven of the eight drivers attended, although two of them arrived late. Union agent James Pelissero was also in attendance. After the meeting, Board Agent Harris met with one of the employees who attended the meeting, Alfred Gross, and took Gross' statement as part of the investigation of the prior alleged unfair labor practice.

The representation election was held on May 23, with all eight drivers voting. Four votes were cast in favor of the Union, with two votes against, one void ballot and one challenged ballot.

### Board Proceedings

On May 30, 1975, Tri-City filed objections to the election, alleging that material misrepresentations by the Union and the scheduling of the election during an unfair labor practice investigation required that the election be set aside. A hearing was held before an administrative law judge, at which evidence was received regarding Tri-City's objections and the Union's earlier unfair labor practice charge. The judge found that Cifu's conduct at the May 9 meeting with his employees constituted coercive conduct under Section 8(a)(1) of the National Labor Relations Act. (29 U.S.C. § 158(a)(1). He found no merit in Tri-City's objections to the election. The judge recommended that Tri-City be required to cease and desist from the unfair labor practices, that its objections to the election be overruled, and that the Board certify the results of the May 23 election. The Board adopted the findings, conclusions and recommendations of the judge and issued a certification of the Union as representative of Tri-City's employees.[6]

The Union contacted Tri-City's attorney and served a request to bargain. The attorney replied that he was not an authorized bargaining agent for Tri-City and was unable to respond to the request. On April 8, 1976, the complaint herein was filed, alleging that Tri-City had refused to bargain after receipt of a valid bargaining request. On June 29, the General Counsel filed a motion for summary judgment. In response to Notice to Show Cause, Tri-City alleged that the Union was improperly certified, that the bargaining unit was improper or so vague as to require a hearing to resolve the question of its identity, and that

---

4. Following a hearing in the representation proceeding, the administrative law judge found that it was "undisputed that Cifu stated at this meeting that if the Union came in, he would sell the business within 30 days".

5. Cifu testified that the poll, taken by secret ballot, disclosed two votes in favor of the Union and five votes against.

6. 223 NLRB No. 4 (1976). The Board found the judge's detailed rulings of law on the question of election scheduling to be unnecessary: "It suffices to say that where a charge of the type herein is pending, the Regional Director may, upon receipt of a request to proceed from the charging party, which he received here, proceed with an election."

no proper bargaining request was received.[7] The Board granted summary judgment and entered a bargaining order.

### Summary Judgment

The Board entered summary judgment on the basis that "[a]ll issues raised by the Respondent in this proceeding were or could have been litigated in the prior representation proceeding". While this statement is not entirely accurate, we agree that sum-. mary judgment was appropriate.

The issue of whether the Union made a proper bargaining request was obviously neither litigated nor litigable in the earlier hearing. The Board, however, properly found on the basis of undisputed testimony that an adequate notice was served on Tri-City's attorney. For determining whether there has been a proper demand by a Union to bargain collectively, knowledge gained by an attorney may be imputed to the employer. See *NLRB v. Albuquerque Phoenix Express*, 368 F.2d 451, 453 (10 Cir. 1966).

The balance of the issues raised were either litigated, e. g., the misrepresentation issue, or litigable, e. g., the dispute over bargaining unit, at the prior hearing. Board policy properly prohibits repeated litigation of factual issues absent some compelling reason, such as discovery of new evidence. *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 162, 61 S.Ct. 908, 85 L.Ed. 1251 (1941). The only reason offered here, newly discovered evidence in the form of expired Teamster contracts with similar enterprises, was rejected by the Board on the ground that the contracts were available at the time of the prior hearing. Nothing in the record compels us to disagree with that conclusion. Since the record discloses no material factual issues not litigated or litigable at the earlier hearing, the Board could properly dispose of the unfair labor practice charge by summary judgment. Accordingly, we are concerned solely with the question of whether the Board

properly certified the Union. Tri-City contends that the Board erred in the underlying representation proceedings in overruling Tri-City's election objections.

### Scope of Review

Congress has entrusted the Board with a wide degree of discretion in representation proceedings, and our scope of review is limited. *NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946); *Coronet-Western v. NLRB*, 518 F.2d 31, 32 (9 Cir. 1975). The party challenging an election has a heavy burden to show that coercion prevented a fair election and to overcome the "presumption that 'ballots cast under the safeguards provided by Board procedure reflect the true desires of the participating employees'". *NLRB v. Sauk Valley Mfg. Co.*, 486 F.2d 1127, 1130 (9 Cir. 1973), citing *NLRB v. Zelrich Co.*, 344 F.2d 1011, 1015 (5 Cir. 1965). We therefore examine the evidence to determine whether there is substantial evidence in the record as a whole to sustain the Board's findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 95 L.Ed. 930 (1951).

### Allegations of Election Misconduct

The objections filed by Tri-City on May 30, 1975 alleged that the election should be set aside because (1) the Union made misrepresentations of fact at the election eve meeting, to which Tri-City had no opportunity for reply, and which confused and misled the voters; (2) the Union filed an unfair labor practice charge against the company several days before the election in order to coerce and intimidate it from electioneering; and (3) the Board conducted the election while this unfair labor practice charge was pending, and a Board agent investigated the charge on the day before the election, thereby destroying the laboratory conditions required for an election. Tri-City makes the same contentions in arguing that enforcement should be denied.

---

7. The response also contained other contentions which the Board resolved against Tri-City

and which are not argued strenuously on appeal. We also find them to be without merit.

## Alleged Misrepresentations

At the time of the election on May 23, 1975, Tri-City's drivers were paid on a commission basis, with a guarantee of $160 per week for the first $1,000 of volume and 5 per cent of the excess over $1,000. About three weeks earlier, on April 30, 1975, two master contracts covering commercial laundry deliveries in the Riverside area expired, and the parties were negotiating new contracts. As noted *supra*, Tri-City had not been a party to either contract.

The contracts had been of two types—"industrial" and "linen". The industrial contract covered drivers handling heavier items such as grease rags, coveralls, and mechanic's uniforms used by garages. Union drivers covered by this contract were paid $85 for the first $400 in volume handled, in any week. The linen contract covered the delivery of "flatwork"—linen tablecloths, napkins, chef's coats, chef's pants, aprons [8] and similar items for use in restaurants, beauty parlors, and similar enterprises.[9] Under the linen contract, Union drivers received a flat wage of $5.22 per hour.[10] It is undisputed that Tri-City would have been covered by the linen contract rather than the industrial contract had it been organized under these agreements.

At the election eve meeting, Papke discussed Union wages and benefits with seven of Tri-City's eight drivers. Tri-City contends that Papke represented to the employees that by voting in the Union they would be covered by the industrial contract, under which they would receive a raise of approximately $50 per week. In fact, as noted above, companies serving the type of clientele served by Tri-City were covered by the expired linen agreement, which might well pay less than the drivers were earning under their non-Union agreement with Tri-City.

Three of the drivers who attended the May 22 meeting testified at the hearing on Tri-City's objections.[11] The testimony of Dana Owen is typical. He stated on direct that Papke "told us we would get an industrial contract" if the Union was voted in. On cross, he confirmed that Papke stated that the drivers would get industrial contract benefits if they "[voted] the union in and [paid] $10 a month union dues". On further cross-examination, however, Owens changed his testimony:

> Q: Isn't it also a fact that at no time during that meeting did Mr. Papke tell you or any other employee present in that meeting, that he would get the industrial rate of compensation for you if the union was voted in?
>
> A: *He said he would try to get it for us.*
>
> .　　.　　.　　.　　.
>
> Q: But he made no promises?
>
> A: *He said he could almost guarantee it* was his words.

(Emphasis added).[12]

Papke testified that in response to a question from one of the drivers, he explained that there were two separate contracts, i. e., the industrial contract and the linen contract, and that the issue of which contract would be applicable to Tri-City would be subject to negotiation with Cifu.

---

8. The industrial contract covered the delivery of "garments". However, in industry usage, "garments" would not include chef's coats, chef's pants, and aprons.

9. The contract included a provision that any linen contract driver who in fact handled industrial items would be paid at the industrial rate.

10. The Union was seeking a new wage scale under the industrial contract for a $100 a week guarantee for the first $400, plus 10 per cent of the excess, and a 45 cents an hour raise under the linen contract.

11. Tri-City refers at length to isolated statements of the employee witnesses which, taken out of context, support Tri-City's contentions. There was clearly a conflict in the testimony. We are concerned of course, with whether viewing the evidence as a whole there was substantial evidence to support the Board's findings.

12. Employee Gross likewise testified on cross-examination that Papke indicated that the contract benefits were subject to negotiation. Employee Miller, however, testified that it was his understanding that the industrial contract was "cut and dry" if the drivers voted the Union in.

He denied making any promises to the employees concerning wages of benefits or that he told them that the company would be compelled to sign an industrial contract.

Based on the testimony of Owen and the other two employees, the Board found that "the concensus of the testimony of the employees was that Papke at no time made any firm promise or commitment concerning wage increases or benefits or the type of contract which would be applicable to Respondent's business". The Board found further, upon a "reconciliation of the conflicting testimony, and based on the appearance and demeanor of the witnesses involved", the Union representatives did not make any misrepresentations, and that "Papke's statements concerning the industrial contract, which he differentiated from the linen supply contract, did not, in fact, amount to misrepresentations or mislead the employees" and that they were "well within the capacity of the employees to evaluate".

■ Under the Board policy in effect when this case was decided, an election was invalidated "only where a material fact has been misrepresented, the opponent had no opportunity to reply, and the resulting lopsided presentation significantly impaired the election process". *NLRB v. Winchell Processing Corp.*, 451 F.2d 306, 307–8 (9 Cir. 1971); see *Hollywood Ceramics Co.*, 140 NLRB 221 (1962).[13] Here the Board found that there were no misrepresentations of material facts and that the statements of the Union representative were well within the capacity of the employees to evaluate. We conclude that there is substantial evi-

dence in the record as a whole to support these findings.

### Unfair Labor Practice Investigation

■ We recognize that the Board has adopted a general policy against proceeding in a representation case while an unfair labor practice charge is pending, but that policy is not without exception. In fact, the Field Manual specifically provides that a representation case may be processed in the face of the pendency of a charge where the charging party—here the Union—executes a "request to proceed". See NLRB Field Manual, § 117.30 (G.P.O.1971); *Louis-Allis Co. v. NLRB*, 463 F.2d 512, 516 (7 Cir. 1972). Apparently mindful of this rule, the Union filed such a request when it filed its unfair labor practice charge on May 18, 1975. Since the election was conducted in full conformance with Board policy, our review is limited to a determination of whether the scheduling of the election constituted an abuse of the Board's wide discretion in supervising elections.[14] See *NLRB v. Sauk Valley Mfg. Co., supra*, 486 F.2d at 1130; *Furr's, Inc. v. NLRB*, 350 F.2d 84, 86 (10 Cir. 1965).

Tri-City contends (1) that "the Union with the assistance of the Board secured a partisan advantage by abuse of the Board's processes", thereby tainting the election with resulting prejudice to Tri-City; and (2) that the regional director "abused his discretion by proceeding with the election procedure and investigating the unfair labor charges the night before the election".

First, we reject Tri-City's contention that the Union misused Board processes.[15] The Board concluded that there was "no basis

---

13. The Board recently overruled *Hollywood Ceramics* and announced a policy change under which it will no longer set elections aside solely because of misrepresentations of material fact. *Shopping Kart Market, Inc.*, 228 NLRB No. 190 (1977). In view of our conclusion that there is substantial evidence to support the Board's finding that there were no material misrepresentations, it is unnecessary to consider the effect of the *Shopping Kart* rule and particularly whether it should be applied retroactively.

14. We reject any suggestion that scheduling an election contemporaneously with an unfair la-

bor practice investigation constitutes an abuse of discretion *per se*.

15. The cases cited by Tri-City are factually distinguishable. None hold that the act of filing an unfair labor charge while an election is pending in itself may support a charge of misuse of Board process. Since we agree with the Board that the evidence discloses no wrongful motive, we do not reach the question of whether the Union's activities, if wrongfully motivated, would constitute an abuse of process.

for a finding that the unfair labor practice charge, which has been found to have had merit, was filed for any purpose other than to vindicate the employees' rights". We agree with the Board's finding that "no evidence was adduced to support" the allegation "that Papke publicized the charge to impress the employees with their need for protection".

Second, we find no evidence in the record that Tri-City suffered substantial prejudice from any action of agent Harris. Cifu testified that Harris recommended that Cifu refrain from discussing wages and benefits with his employees without advice of counsel, and that he had no further discussion with the employees. The Board found that the "Board agent was merely responding to Cifu's request for advice, and recommended that he consult an attorney knowledgeable in labor relations", and that it cannot be "assumed that Cifu was inhibited in any legitimate campaigning by the advice of the Board agent". Had Cifu followed the agent's advice, he would have consulted counsel and ascertained his rights with respect to further campaigning.

■ We agree that Board agents should maintain the highest integrity and avoid even the appearance of favoritism. *Delta Drilling Co. v. NLRB*, 406 F.2d 109, 113 (5 Cir. 1969). There is no claim of impropriety on the part of Agent Harris, except for the timing of the investigation. We conclude that the Board could properly find that there was no evidence of favoritism or partiality in Harris' conduct. He contacted only one employee, Alfred Gross. Gross testified that Harris told him "that Mr. Cifu had been brought up on unfair labor practice charges, and that he would like to have a meeting with me to get a deposition from me to find out whether the charges were warranted". There is nothing in the

record to indicate that Harris said or intimated that the charges were true; Gross' testimony establishes quite the opposite, that Harris indicated he needed to take evidence to see whether the charges had merit.

■ Tri-City urges that Harris' interrogation so confused Gross that he cast a blank ballot, indicating that Harris' conduct "directly affected one employee, and may have affected others". There is no evidence, however, that any other employee was contacted by Harris or was aware of Harris' interview with Gross. And, as indicated above, it has not been shown that anything Harris said to Gross was improper.[16] There is substantial evidence to support the Board's findings that Tri-City failed to establish partiality or favoritism in Harris' conduct or abuse of discretion in proceeding with the election.

### Conclusion

We conclude that there is substantial evidence in the record as a whole to support all of the Board's findings and that Tri-City has failed to sustain its burden of showing that the Board abused its discretion in certifying the results of the election. Accordingly the Board's application for enforcement of its order is granted.

---

16. Gross testified that he could not hear well at the May 22 meeting with Papke, and that he consequently was confused when he left the meeting. Evidently a combination of this confusion and Harris' questions induced Gross to vote blank. The administrative law judge properly rejected Tri-City's offer to prove that Gross intended to vote against the Union. Subjective declarations of intent are not admissible to show how an employee would have voted. *T and G Mfg. Co.*, 173 NLRB 1503 (1969).