**PACIFIC SOUTHWEST AIRLINES, and Pacific Southwest Airmotive, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–1305.

United States Court of Appeals, Ninth Circuit.

Dec. 18, 1978.

Ronald G. Rickard (argued), of Meserve, Mumper & Hughes, Los Angeles, Cal., for petitioners.

Jesse I. Etelson, Atty. (argued), Washington, D. C., for respondent.

Before CHOY and ANDERSON, Circuit Judges, and PALMIERI, District Judge.*

J. BLAINE ANDERSON, Circuit Judge:

Fourteen previously unrepresented PSA[1] employees were added to an existing bargaining unit after the Regional Director[2] certified them as a proper addition to the unit. To obtain judicial review of the unit determination, the employer refused to bargain.[3]

Unfair labor practice charges were filed. The Board found the unit was proper and that therefore PSA had violated §§ 8(a)(1) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1) & (5), when it refused to bargain. Cross petitions for review and enforcement followed. This court has jurisdiction to review the unit determination and the unfair labor practices. 29 U.S.C. §§ 160(e) & (f).

As the parties have recognized, if the unit determination is upheld, the Board's Order should be enforced.[4] We find the unit determination was improper and deny enforcement.

## I. PROCEEDINGS BELOW

Teamsters Local 2707 (the Union) petitioned the Board for certification as bargaining representative for 22 clericals employed at two PSA facilities. The Union sought to represent them as a distinct unit

---

* The Honorable Edmund L. Palmieri, Senior United States District Judge, Southern District of New York, sitting by designation.

1. The parties stipulated that Pacific Southwest Airlines and its subsidiary, Pacific Southwest Airmotive, are joint employers. We refer to them jointly as PSA.

2. Region 21, National Labor Relations Board. The Regional Director is the Board's delegate for purposes of determining the proper unit and certifying the bargaining representative. We accord his findings the same weight as we accord a Board finding. *NLRB v. Gold Spot Dairy, Inc.*, 432 F.2d 125 (10th Cir. 1970).

3. Direct review of a unit determination is unavailable. The employer must refuse to bargain and then raise the issue in the subsequent unfair labor practice proceedings. *NLRB v. Ideal Laundry & Dry Cleaning Co.*, 330 F.2d 712 (10th Cir. 1964).

4. PSA raises two related evidentiary claims and several procedural objections. The new evidence offered by PSA is insubstantial, and issues that could have been raised at the representation hearing cannot be raised for the first time in defense of unfair practice charges. *See NLRB v. W. S. Hatch Co., Inc.*, 474 F.2d 558 (9th Cir. 1973); *Cf. NLRB v. L. D. McFarland Co.*, 572 F.2d 256 (9th Cir. 1978). PSA's objection to the use of summary judgment is meritless: summary judgment is proper when the employer's defense is the unit's appropriateness, and a hearing has been afforded in the representation proceedings. *NLRB v. Tri-City Linen Supply*, 579 F.2d 51 (9th Cir. 1978); *NLRB v. Mar Salle, Inc.*, 138 U.S.App.D.C. 135, 425 F.2d 566 (1970); *NLRB v. E–Z Davies Chevrolet*, 395 F.2d 191, 193 (9th Cir. 1968). Finally, PSA objects to the ex parte postponement of the unfair practice hearing. Inasmuch as PSA has shown no prejudice from the postponement, we decline to review its objection. *NLRB v. Lee Office Equipment*, 572 F.2d 704 (9th Cir. 1978).

or, alternatively, to add them to the production unit [5] already represented by the Union.

Representation hearings were held to determine the appropriate unit. At the hearings, PSA presented evidence to support its contention that these employees should be grouped in a unit with all the office clericals employed at the two facilities. PSA's office clericals are not unionized.

The Regional Director ordered that an election be had among 14 of the 22 proposed unit members.[6] According to the Order of Election, if the employees voted in favor of the Union's representation, they were to be comprised in the production unit. If the employees voted against the Union's representation, they were to remain outside the production unit. Thus, the unit determination was a function of employee choice, but the employees could not choose to be represented as a separate unit.

The employees voted 11 to 2 to be represented by the Union and perforce to join the existing unit.

## II. FACTS

The main office building at PSA's San Diego headquarters is utilized as follows:

first floor: aircraft maintenance hangar; shipping and receiving stockroom; foreman's office;

second floor: parts stockroom; upholstery shop; storage area; lunchroom; dispensary; and offices for personnel, maintenance, planning and records, purchasing and invoice control, engineering and finance, and avionics;

third floor: executive and administrative offices; computer room; office storeroom; and offices for sales, accounting, mail, public relations and keypunching.

---

5. The existing unit encompasses all production and maintenance employees. We refer to this and other production and maintenance units as production units.

6. The exclusion of the other eight proposed unit members was unchallenged. One of the fourteen cast a challenged ballot because her eligibility was still undetermined.

Most of the production workers in the existing unit work on the first floor. Most of the office clericals, a group numbering approximately 100, work on the third floor; some work on the second floor, and a few work in different buildings. Ten of the fourteen disputed employees work on the second floor; [7] the other four work fifteen miles away at PSA's facility on Consolidated Way.

At the Consolidated Way facility, there are two floors:

first floor: engine overhaul area; administrative offices; stockroom;

second floor: inspection and records department; and offices for administrative functions, purchasing, clericals, and engineering personnel.

One hundred eighty employees work here; only a few are office clericals. The four disputed employees are evenly divided between the first and second floors.

PSA contends the evidence shows the disputed employees have much more in common with office clericals than they have in common with production employees. The Board contends the evidence shows the disputed employees are plant clericals and belong in the production unit, in accordance with established Board policy. The evidence may be summarized as follows:

1. all clericals [8] work the same eighthour day, five days per week; production employees' work week consists of four ten-hour days;

2. production workers are uniformed, clericals are not;

3. all clericals are compensated under the same wage and benefit scheme; production workers are compensated under a different pay scheme, according to the collective bargaining agreement;

---

7. One of the ten actually works on a mezzanine between the first and second floors.

8. We refer to the fourteen employees found to be plant clericals by the Board as the disputed employees. Members of the existing unit are referred to as production workers. "Clericals" includes office clericals and the disputed employees.

4. wages for production workers are much higher than wages for clerical workers;

5. all clericals are hired as general clericals and then assigned a particular job;

6. the disputed employees work at desks in an office atmosphere, but are physically segregated from office clericals;

7. there is almost no interchange between office clericals and the disputed employees; there is some interchange between production workers and the disputed employees;

8. some of the disputed employees are supervised by accounting and finance personnel; some are supervised by production personnel;

9. similarly, some disputed employees are in the accounting and finance department; some are in the production department;

10. considered as a group, the disputed employees spend ten to fifteen percent of their time in contact with production employees, mostly by telephone; contact with office clericals is negligible;

11. use of secretarial skills is limited, but the bulk of the skills used (e. g., keypunching, handposting, typing, filing) are more closely related to clerical skills than they are to skills used in most production work;

12. the work performed by the disputed employees relates equally to the production and accounting departments: they compile, correlate, and record, often in final form, information concerning inventory, equipment, shippings, etc.; and

13. once recorded, the information is used primarily by the accounting department.

### III.  APPLICABLE LAW

■ The Act provides that the Board shall designate an appropriate unit for bargaining to secure employees the fullest freedom in exercising their rights. 29 U.S.C. § 159(b). As in other situations,[9] the Board balances individual freedom against the need for efficiency and stability in bargaining when determining an appropriate unit. *See, e. g., Allied Chemical & Alkali Workers, Local Union 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 172, 93 S.Ct. 383, 30 L.Ed.2d 341 (1971); *Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 153, 165, 61 S.Ct. 908, 85 L.Ed. 1251 (1941). But as the statute expressly dictates, employee freedom must be paramount. 29 U.S.C. § 159(b); *see Sheraton-Kauai Corp. v. NLRB,* 429 F.2d 1352 (9th Cir. 1970); *Retail, Wholesale and Department Store Union v. NLRB,* 128 U.S.App.D.C. 41, 385 F.2d 301, 303–04 (1967).

■ The Act provides that the Board's findings of fact are conclusive if supported by "substantial evidence on the record considered as a whole." 29 U.S.C. 160(f). But the factual disputes here are minimal; the legal conclusions to be drawn from the evidence are the heart of the controversy. *NLRB v. Kostel Corp.,* 440 F.2d 347 (7th Cir. 1971). *See generally Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074 (9th Cir. 1977). Because this is an area where special expertise is needed, the Board has exceptionally broad discretion in determining an appropriate unit. *NLRB v. Sunset House,* 415 F.2d 545, 548 (9th Cir. 1969); *NLRB v. Swift & Co.,* 162 F.2d 575, 580–81 (3d Cir. 1947). Unless clearly arbitrary or capricious, the Board's legal conclusion—that the unit is appropriate or inappropriate—will be credited on appeal. *NLRB v. Mercy Hospitals of Sacramento, Inc.,* 589 F.2d 968 (9th Cir. 1978); *NLRB v. Moss Amber Mfg. Co.,* 264 F.2d 107, 110 (9th Cir. 1959). Consequently, the burden is on PSA

**9.** For example, when the employer claims the union no longer represents a majority, *NLRB v. Tahoe Nugget, Inc.,* 584 F.2d 293 (9th Cir. 1978), or when the Board fashions a remedial order. *See generally Local Lodge No. 1424, I. A. M. v. NLRB,* 362 U.S. 411, 428, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960).

to demonstrate why the unit is clearly inappropriate. *NLRB v. Doctors' Hospital of Modesto, Inc.*, 489 F.2d 772, 776 (9th Cir. 1973); *Banco Credito y Ahorro Ponceno v. NLRB*, 390 F.2d 110, 112 (1st Cir. 1968), cert. denied, 393 U.S. 832, 89 S.Ct. 101, 21 L.Ed.2d 102 (1968); cf. *NLRB v. Yutana Barge Lines, Inc.*, 315 F.2d 524 (9th Cir. 1963).

■ In determining whether a unit is appropriate, the Board considers:

1. similarity in skills, interests, duties, and working conditions;
2. functional integration of the plant, including interchange and contact among the employees;
3. the employer's organizational and supervisory structure;
4. the employees' desires;
5. bargaining history; and
6. the extent of union organization among the employees.

*See Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. at 153, 61 S.Ct. 908; *NLRB v. Security-Columbian Banknote Co.*, 541 F.2d 135, 140 (3d Cir. 1976); N.L.R.B., *Fourteenth Annual Report* 32–33 (1949); American Bar Ass'n, *The Developing Labor Law* 201, 231 (C. Morris ed. 1971). The critical determinant is whether the employees share a substantial community of interests sufficient to justify their mutual inclusion in a single bargaining unit. *NLRB v. Adrian Belt Co.*, 578 F.2d 1304 (9th Cir. 1978); *NLRB v. Ideal Laundry & Dry Cleaning Co.*, 330 F.2d 712, 716 (10th Cir. 1964); T. Kheel, *Labor Law* § 14.02[1] (1978); N.L.R.B., *Fifteenth Annual Report* 39 (1950).

■ Unit determinations are peculiarly dependent on slight variations of fact: thus, rigid rules are impossible to administer. *See NLRB v. Mar Salle, Inc.*, 138 U.S.App.D.C. 135, 425 F.2d 566, 569 (1970); *NLRB v. Swift & Co.*, 162 F.2d at 580.

[11] Nonetheless, based on its practical experience over the years, the Board has adopted several general rules germane to the issues before us:

1. Office clericals will not be joined with either plant clericals or production workers in a single unit because the requisite community of interest is lacking. *Swift & Co.*, 119 N.L.R.B. 1556 (1958) (notes exception for "unusual circumstances"); *The Kroger Co.*, 204 N.L.R.B. 1055 (1973).
2. Plant clericals can constitute an appropriate unit by themselves. *Plakington Packing Co.*, 116 N.L.R.B. 1225 (1956); see *The Rudolph Wurlitzer Co.*, 117 N.L.R.B. 6 (1957).
3. Plant clericals share a community of interests with production workers such that together they constitute an appropriate unit. *Goodman Mfg. Co.*, 58 N.L.R.B. 531 (1944); *Emsco Derrick & Equipment Co.*, 72 N.L.R.B. 378 (1947); *Art Metal Construction Co.*, 75 N.L.R.B. 80 (1947).
4. When one of the unions seeking to represent the plant clericals already represents the employer's production workers, the plant clericals shall be allowed an election. If the plant clericals choose the union that already represents the production workers, the plant clericals will be added to the existing unit.[10] *Foster Wheeler*

---

**10.** The plant clericals form a voting group. When only one union is on the ballot, a union majority results in the plant clericals being represented as part of the production unit; a no-union majority results in the plant clericals continuing to be unrepresented outside the existing unit. *General Petroleum Corp.*, 83 N.L.R.B. 514 (1949); *Art Metal Construction Co.*, 75 N.L.R.B. 80 (1947). When another union is on the ballot, the above rules still apply, but a separate unit of plant clerical will be certified if the second union is victorious. *E. g., Armour & Co.*, 64 N.L.R.B. 290 (1945); *The Armstrong Rubber Co., Pacific Coast Division*, 144 N.L.R.B. 115 (1963); see *NLRB v. Local 404, Int'l Brotherhood of Teamsters*, 205 F.2d 99 (1st Cir. 1953). Before any self-determination election is had, regardless what type of employees are involved, the Board must first determine what units would be appropriate. The Board cannot delegate this preliminary duty to the employees. *Compare NLRB v. Underwood Machinery Co.*, 179 F.2d 118 (1st Cir. 1949) *with Marshall Field & Co. v. NLRB*, 135 F.2d 391 (7th Cir. 1943) *and NLRB v. Local 404, Int'l Brotherhood of Teamsters*, 205 F.2d at 103. Once the elections are completed, the Board then makes its final unit determinations based on all the facts,

*Corp.*, 94 N.L.R.B. 211 (1951); *see J. R. Reeve & A. Teichert & Sons, Inc.*, 89 N.L.R.B. 54 (1950).

These general rules [11] are premised on the fact that normally there will be a distinct difference between office clericals and plant clericals. *See* General Counsel, N.L. R.B., *Outline of Law and Procedure in Representation Cases* 250–53 (June 1974).

Although the premise is somewhat at odds with the Board's view that each case must be decided *ad hoc*,[12] we believe in most cases the general rules can be a worthwhile guide for employer and union alike. Yet in close cases where the difference is indistinct, the general rules cannot be rigidly applied without serious risk of error.

It is the fourth rule—that plant clericals will automatically be added to the existing unit if the same union representative is chosen—which is most troubling. The rule apparently had its genesis outside the plant clerical context. See, *e. g., Armour & Co.*, 40 N.L.R.B. 1333 (1942) (coopers, engineers, and electricians designated as separate voting groups; any group voting in favor of union's representation to be merged into production unit already represented by union); *Guilford Hosiery Mills, Inc.*, 70 N.L. R.B. 1047 (1946) (boarders allowed to vote separately, but record clerks deemed within production unit). And although this rule has been a tenet of Board policy for thirty years, *e. g., Chrysler Corp.*, 76 N.L.R.B. 55 (1948), nowhere in the decisions cited by the Board do we find an adequate explication of the reasons underlying the policy.

The initial decisions applying this policy to other employee groups rely on the com-munity of interests doctrine and the Board's practical judgment. A few decisions, handed down sometime after the policy was first applied to plant clericals, simply reiterate that again it is the Board's practical judgment that such joinder is in the best interests of all the parties when plant clericals choose the same union. *E. g., Fisher Controls Co.*, 192 N.L.R.B. 514 (1971). Such conclusory judgments hamper our review of Board policy when the underlying reasons are not readily apparent. *See NLRB v. Western & Southern Life Ins. Co.*, 391 F.2d 119 (3d Cir. 1968), *cert. denied*, 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 439 (1968).

Often, where the Board fails to provide a rationale for its adoption of a rule, or for its decision in a case, the proper course for a reviewing court is to order a remand for explication by the Board of its reasons. *See NLRB v. Weingarten, Inc.*, 420 U.S. 251, 268–69, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975) (Burger, C. J., dissenting); *NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). However, a remand is improper where the reviewing court can determine that the rule or decision does not further the Act's policy. Therefore, we must inquire whether the rule adopted by the Board, that plant clericals will automatically be added to the existing unit if they chose the same union representing that unit, reasonably furthers the policy of the Act in the instant case.[13]

---

the principal fact then being the election result. In effect, the Board interprets a vote in favor of union representation as tantamount to a vote in favor of a particular unit. *See generally J. I. Case Co.*, 87 N.L.R.B. 692 (1949).

Inasmuch as the unit may vary not only according to whether union representation is desired, but also according to which union is selected, there is an inescapable inference that the employees' common interests may be subserving organizational objectives in the name of employee freedom. *See D. V. Displays Corp.*, 134 N.L.R.B. 568 (1961). Here, the employees' freedom is limited by their ballot alternatives.

**11.** The Board may deviate from its standard practice when the parties agree to a different alignment of employees. *Swift & Co.*, 131 N.L. R.B. 1143, *modifying* 129 N.L.R.B. 1391 (1961).

**12.** N.L.R.B., Thirteenth Annual Report 36 (1948).

**13.** We do not substitute our judgment for the Board's in so reviewing the adoption of the rule. Instead, we review the Board's decision according to established standards—the Board's own criteria for unit determinations—by inquiring whether the unit forged by application of the rule in this case has the requisite

## IV. *ANALYSIS*

When applying the foregoing general rules, a two-step process must be followed. First, a definition of plant clericals, consistent with the Act's policies, must be derived. Second, it must be determined whether these employees fit the definition. In the briefs, both parties focus on the second step. The definitional step is omitted.[14]

In reviewing the Board's determination, we focus the issue more precisely by simply asking: Do these employees share a sufficient community of interest with production workers to justify a single unit.[15] To answer this question, we apply the criteria developed by the Board. First, however, we review the Board's prior decisions.

### A. Existing Precedent

Each party asserts that precedent supports its position. Although each unit determination is unique, we find court and Board decisions dealing with similar fact patterns are more easily reconciled with the employer's position. An affirmance of this unit determination would represent a definite, albeit small, extension of the case law to date.

We recognize that perfect consistency cannot be demanded when numerous decisions covering diverse facts are spread over four decades. Yet when a general rule is distilled from the reported decisions, the deficiencies in the instant determination, as contrasted with existing precedent, become apparent.

The general rule may be stated:

"When clerical employees work in a place which is separate and apart from that of office clerical employees, which place is located in the plant area, where they perform duties related to production, and have substantially the same working hours and fringe benefits as the production and maintenance employees, they are regarded as plant clericals, and normally included in the production and maintenance units, even if they are compensated and supervised on the same basis as office clerical employees."

J. Jenkins, *Labor Law* 377 (1948). Here the disputed employees (1) are not located in the plant area, (2) perform duties only distantly related to production, and (3) have substantially different working hours and fringe benefits. A few illustrative examples follow.

In *Container Research Corp.*, 188 N.L.R.B. 586 (1971), the contract coordinators assigned job numbers and maintained production records and shipping logs. Although their duties entailed contact with production workers and only light typing, they were excluded from the production unit. Another employee, supervised by the manufacturing manager, "gather[ed] information on the cost of material and labor for company records;" he was also excluded from the unit although he regularly entered the plant floor to obtain the necessary data. The materials coordinator, who verified receipt and use of production materials, was deemed an office clerical because, the Board said, "although [she] spends about 25 percent of her time in the production area and thus has daily contact with production and maintenance personnel, it appears that her principal functions and duties relate to the general office operations . . . ." Material planners were included in the unit, but they did substantial work on plant floor, "issue[d] shop orders to production personnel," and received earnings and benefits comparable to unit members.

communal interests. Although the Board's approach may be an imperfect but acceptable alternative in most cases, the relevant inquiry is its efficacy under the facts and circumstances of this case.

14. We look to the case law to find a workable, apposite definition. Because the factual variations are infinite, precedent cannot precisely define the term. The definitions we have found are inadequate. *See Wilson & Co., Inc.*, 97 N.L.R.B. 1388 (1952). This reinforces our belief that a more direct approach is preferable.

15. The Board itself occasionally adopts this more direct approach, eschewing definitional boxes. *E. g., General Petroleum Corp.*, 83 N.L.R.B. 514 (1949).

Many cases cited by the Board are easily distinguished. In *Fisher Controls Co.*, 192 N.L.R.B. 514 (1971), factory clerks included in the production unit performed work "closely allied" with production work, and shared similar hours and interchanged jobs with plant employees. In most other instances, the work of the plant clericals was highly integrated with production work, *e. g., Great Lakes Pipeline Co.*, 88 N.L.R.B. 1370 (1950) (clerk's duties vital to actual flow of pipeline), or the hours, wages, and conditions were similar to those of unit members. *E. g., NLRB v. Adrian Belt Co.*, 578 F.2d 1304 (9th Cir. 1978) (same hours and rest breaks; some interchange with production work); *Wichita Falls Foundry & Machine Co.*, 69 N.L.R.B. 458 (1946) (same hours, supervision, and work place).

The line between plant and office clerical is faint; sometimes it disappears. Nonetheless, a survey of representative cases shows that employees with duties and job titles corresponding to those here are usually placed on the office clerical side of the line. *E. g., The Armstrong Rubber Co., Pacific Coast Division*, 144 N.L.R.B. 1115, nn. 13–14 (1963); *Robbins & Myers, Inc.*, 144 N.L.R.B. 295, 298 nn. 5–6 (1963). Other cases show that, regardless of job titles, employees similarly situated to the PSA employees here are frequently excluded from production units. *E. g., NLRB v. Mar Salle, Inc.*, 138 U.S.App.D.C. 135, 425 F.2d 566, 570 (1970) (admission clerks who interview patients and record data excluded); *The Kroger Co.*, 204 N.L.R.B. 1055 (1973) (mail clerks in enclosed loft deemed office clericals); *see Jelco, Inc.*, 209 N.L.R.B. 827 (1974) (material expediter and assistant materials purchaser deemed office clericals outside coverage of bargaining agreement); *cf. American Radiator & Standard Sanitary Corp.*, 114 N.L.R.B. 1151 (1955) (warehouse and shipping clericals). *Contra, Astronautics Corp. of America*, 210 N.L.R.B. 652 (1974) (salaried clericals that work with final inventory and stockbook figures added

to production unit); *Vulcanized Rubber & Plastics Co., Inc.*, 129 N.L.R.B. 1256 (1961).

Decisions affecting other, analogous employee groups also undercut the Board's position. In *Stephens Produce Co., Inc. v. NLRB*, 515 F.2d 1373 (8th Cir. 1975), the court affirmed the Board's finding that meat department employees' distinct duties, segregated work area, and independent supervision gave them a separate community of interest.

Technical employees have also been afforded separate representation when the facts warrant it. *E. g., Robbin & Myers, Inc.*, 144 N.L.R.B. 295 (1963); *The Armstrong Rubber Co., Pacific Coast Division*, 144 N.L.R.B. 1115 (1963). This more flexible approach promises greater precision than the *per se*, definitional approach the Board applies to plant clericals. *Sheffield Corp.*, 134 N.L.R.B. 1101 (1961) (Board placed some technical employees in production unit, but excluded others based on particularized assessment of each group's community of interests). *See generally* General Counsel, N.L.R.B., *Outline of Law and Procedure in Representation Cases* 253–55 (1974). Flexibility is also evident in the Board's approach to other segregable employee groups. *Mountain States Telephone & Telegraph Co. v. NLRB*, 310 F.2d 478 (10th Cir. 1962) (distinct community of interest among employees at single location warranted deviation from system-wide units); *Banco Credito y Ahorro Ponceno v. NLRB*, 390 F.2d 110 (1st Cir. 1968) (one branch bank deemed an appropriate unit though thirteen other branches formed single unit); *see Felix Half & Brother, Inc.*, 132 N.L.R.B. 1523 (1961) (residual unit).

In determining whether new employees should be accreted—*i. e.*, added without an election—to an existing unit the Board also measures the community of interests among the disputed employees. Thus, accretion precedents, though distinguishable,[16]

---

**16.** Because it deprives new employees of any present opportunity to affect the group's organizational choices, accretion is a narrower doctrine: to be accreted, the new employees must

have no separate identity, and therefore nothing approaching a distinct community of interests, apart from the larger group. *NLRB v. Food Employers Council, Inc.*, 399 F.2d at 502–

are helpful. In *NLRB v. Food Employers Council, Inc.*, 399 F.2d 501 (9th Cir. 1968), the Board, in denying accretion, found that snack bar employees in retail food markets had common interests separate and distinct from the other retail clerks in the market. This court upheld the Board despite the fact that the record showed considerable evidence of common interests between snack bar employees and unit members; in fact, the differences in working conditions, etc., were trivial compared with the differences in the instant case. *See also NLRB v. Security-Columbian Banknote Co.*, 541 F.2d 135 (3d Cir. 1976); *NLRB v. Sunset House*, 415 F.2d 545 (9th Cir. 1969).

We recognize that precedent should not constrain the Board from extending established policy to additional situations. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 265–66, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). If the Board's stated criteria do not support its decision, however, we must conclude the Board has erred. *See generally NLRB v. Columbia University*, 541 F.2d 922 (2d Cir. 1976).

### B. Application of the Factors

#### 1. Similarity in Employee Skills, Duties, and Working Conditions

The most reliable indicium of common interests among employees is similarity in their skills, duties, and working conditions. *See Allied Chemical & Alkali Workers of America, Local Union 1*, 404 U.S. at 172, 93 S.Ct. 383; N.L.R.B., *Fifteenth Annual Report* 39 (1950); American Bar Ass'n, *The Developing Labor Law* 217–19 (C. Morris ed. 1971). This factor augurs poorly for adding these employees to the existing unit, for the differences far exceed the similarities.

The wages and benefits are totally dissimilar. The hours and days worked are different. Dress is different. The skills used are closely related to office clerical skills and unrelated to skills used by most unit members. The duties performed are unlike duties performed in actual production work. Finally, these employees are physically segregated from production areas and work in an office setting. *Cf. NLRB v. Clarostat Mfg. Co.*, 216 F.2d 525 (1st Cir. 1954).

#### 2. Integration of Function and Personnel

The work of the disputed employees does complement the work of parts clerks and a few other unit members. Some mutual interests would therefore follow. Also, there has been some interchange between the disputed employees and unit members, but it has been sporadic and infrequent.

The complementary work does lead to contact between the disputed employees and unit members, a fact the Regional Director relied on in deciding these employees were plant clericals. But the work is only complementary, integrated in small part, and the resulting contacts do not predominate any employee's time, nor are they common to all the disputed employees. For the most part, unit members with whom contact does occur represent a few employees at the margin of the unit. Some of the present unit members are stock clerks and plant clericals; their membership in the unit is chiefly predicated on their contact and integration with production work and production workers. They are the ones who have contact with the disputed employees, and these contacts concern the more clerical aspects of their job. The resulting intersection of interests is therefore attenuated and *de minimis.*

03. It follows that accretion may be initially rejected as a legitimate alternative, though the employees are subsequently added to the existing unit once they have elected to do so. That is, a refusal to accrete is merely a conclusion that a minimal quantum of common interests exists among the new employees; it does not preclude a finding that the interests shared by the two groups are sufficient to justify adding the new employees to the established unit if the new employees want to join the established unit. *Compare Boire v. International Brotherhood of Teamsters*, 479 F.2d 778 (5th Cir. 1973) *with Westinghouse Electric Corp. v. NLRB*, 440 F.2d 7 (2d Cir. 1971), *cert. denied*, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971).

Although even this intersection of interests, remote from the core interests of production work, cannot be discounted entirely, it cannot vault a group of employees whose interests are foreign to production work into a production unit. Otherwise a domino effect occurs, and the unit expands one group at a time along tangents remote from the unit's nucleus. Here, a few employees share a few interests with a few unit members. That is not enough. The nature of the contact underscores this fact.

The contact shown below was primarily by telephone, an indication that any mutuality of interest may be indifferent and superficial. By contrast, true plant clericals usually have frequent, personal contact with production workers in production areas. *E. g., ACF Industries, Inc.*, 115 N.L.R.B. 1106 (1956) (shop clerks' time: one-fifth on production floor, four-fifths in plant foreman's office). Typically, they will routinely enter production areas to obtain information and then prepare records for use by production personnel. *Compare Great Lakes Pipeline Co.*, 88 N.L.R.B. 1370 (1950) (billing clerks obtained information from "plant floor") *with Foster Wheeler Corp.*, 94 N.L.R.B. 211 (1951) (stockroom clerks prepared records for direct use of production department). Here, there are few trips to the plant floor by the disputed employees, and the records prepared by them are primarily for use by accounting and administrative personnel. *See Container Research Corp.*, 188 N.L.R.B. 586 (1971).

### 3. Employer's Organizational Framework

The common supervision and placement within the organization does bolster the Regional Director's view of the facts. *See NLRB v. Baton Rouge Waterworks Co.*, 417

F.2d 1065 (5th Cir. 1969). This factor, however, is significant primarily as an indication of how closely the employees work. *See, e. g., Kearney & Trecker Corp.*, 60 N.L.R.B. 148 (1945). *But see Northwest Engineering Co.*, 73 N.L.R.B. 40 (1947). Here, the disputed employees "work in close proximity to each other," but not to anyone else. Thus, with regard to the employees, this criterion adds little support to the Board's determination. The employer, however, also has an interest which should be considered.

The employer can be expected to prefer units drawn along the same lines as the company's internal divisions.[17] And this preference should be accommodated if feasible. As a result, the employer's administrative interests must be contrasted against and reconciled with the coherent interests of the employees.[18] *See NLRB v. Sunset House*, 415 F.2d 545, 549 (9th Cir. 1969).

Often this means a choice between a small unit or addition proposed by the union and a larger unit proposed by the employer. Large units will often enhance the prospects for stable labor-management relations, yet small units may be more conducive to employee freedom,[19] the primary consideration in a unit determination. Therefore a Board determination in favor of a small unit can be seen as according greater weight to employee freedom than to stability in bargaining. *NLRB v. Western & Southern Life Ins. Co.*, 391 F.2d at 123. Concomitantly, this usually results in subordinating employer convenience to union organization. *See id.*

The method followed here actually accommodates stability in bargaining and union organization by adding to an existing

17. *E. g., The Great Atlantic & Pacific Tea Co.*, 85 N.L.R.B. 680 (1949).

18. Of course, when the employer seeks to disavow its own internal structure and instead proposes a unit which joins the subject employees with employees uninterested in union representation, we accord almost no weight to the employer's claimed administrative interest. A unit gerrymandered to serve the employer's

self-interest is no better than one gerrymandered to serve the union's organizational objectives.

19. *Compare NLRB v. Western & Southern Life Ins. Co.*, 391 F.2d 119, 123 (3d Cir. 1968) *with NLRB v. Kostel Corp.*, 440 F.2d 347 (7th Cir. 1971) *and Mountain States Telephone & Telegraph Co. v. NLRB*, 310 F.2d 478 (10th Cir. 1962).

unit only when the group to be added favors the union's representation. Although employee freedom is not wholly blunted as it is when accretion is ordered, it is not really a factor in the unit determination itself. See n. 10, *supra*.

Here, none of the suggested units accurately mirrors PSA's administrative structure, although a separate unit would be most likely to further the employer's legitimate interest.

#### 4. Employee Choice

The Act favors freedom of choice. See *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 682 (2d Cir. 1971). The wishes of the employees therefore must be considered. *NLRB v. Ideal Laundry & Dry Cleaning Co.*, 330 F.2d at 717 (remand ordered because Board excluded testimony about desires of employees). Although it may consider other factors, the Board's discretion is broadest when exercised in favor of employee freedom. *NLRB v. Sunset House*, 415 F.2d 545 (9th Cir. 1969). Employee choice can tip the balance in determining which of two equally appropriate units should be preferred. *NLRB v. Local 404, International Brotherhood of Teamsters*, 205 F.2d 99, 103 (1st Cir. 1953). *But cf.* N.L.R.B., *Fifteenth Annual Report* 44–45 (1950) (says policy applies only when multiple unions competing to represent employees in question, then applies policy in favor of self-determination elections when single union seeks to expand unit).

Here, the employees overwhelmingly chose the Union's representation. Two considerations detract from the significance of this factor under these particular facts.

First, the employees only chose union representation. Two other unit configurations were available, but the employees were not polled on which unit they favored. Thus, the election results do not expressly reflect the employees' judgment regarding with

whom they share a community of interests. See n. 10, *supra*.

Second, employees' wishes cannot supplant all other considerations; as the Board has pointed out in other contexts, the parties cannot by consent override the Act's policies or the Board's authority. See *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778 (5th Cir. 1973); *Retail Clerks International Ass'n Local 455 v. NLRB*, 166 U.S.App.D.C. 422, 434 n. 15, 510 F.2d 802, 814 n. 15 (1975). Employee choice cannot be used to justify a gerrymandered unit, particularly when, as here, it may not reflect the employees' judgment of their common interests, but may simply evince employee self-interest. Wages are much higher for unit members than for clericals, and the other clericals are apparently uninterested in union representation. Financial gain may have been the employees' sole motivation.

We do not condemn the election procedure adopted here.[20] Instead, we merely point out that (1) the election cannot speak to issues that are not on the ballot, see *J. I. Case Co.*, 87 N.L.R.B. 692 (1949), and (2) the employer's wishes cannot obviate finding the requisite community of interests: an inappropriate unit cannot be made appropriate at the polls. See *NLRB v. Underwood Machinery Co.*, 179 F.2d 118, 121 (1st Cir. 1949). The Board has made too much of this factor in the instant proceeding.

#### 5. Extent of Union Organization

Like-mindedness about the union movement is one common interest the Board may weigh in determining an appropriate grouping of employees. See *NLRB v. American Life & Accident Ins. Co. of Kentucky*, 394 F.2d 616 (6th Cir. 1968), *cert. denied*, 393 U.S. 913, 89 S.Ct. 237, 21 L.Ed.2d 199 (1968). Here, this factor does support the unit chosen and militates against the unit proposed by PSA. But it also supports a separate unit of the fourteen disputed employees. Furthermore, the

---

**20.** The Board has experimented with a variety of election procedures in different contexts.

Act specifies that this factor cannot be controlling, 29 U.S.C. § 159(c)(5). *International al Ass'n of Tool Craftsmen v. Leedom,* 107 U.S.App.D.C. 268, 276 F.2d 514 (1960), *cert. denied,* 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960). A unit cannot be carved out of a homogeneous work force solely because a few employees desire union representation. *NLRB v. Harry T. Campbell Sons' Corp.,* 407 F.2d 969 (4th Cir. 1969).

How much weight the Board actually gives this factor is unclear. Whatever weight it was given in deciding that the unit chosen was preferable to a unit of all clericals, it could be given no weight in deciding that a single unit was preferable to separate units.

### 6. Bargaining History

Although the Union has represented the existing unit for six years and four elections have previously been had, until now the Union has never sought to include these employees in the unit, even though the collective bargaining agreements specified the inclusion of "plant clericals." This expressly contradicts the Board's conclusion. Although contract interpretations are not binding in Board representation proceedings, *see NLRB v. Horn & Hardart Co.,* 439 F.2d at 680; *Local 7–210, O.C.A.W. v. Union Tank Car Co.,* 475 F.2d 194 (7th Cir. 1973), *cert. denied,* 414 U.S. 875, 94 S.Ct. 68, 38 L.Ed.2d 120 (1973), this evidence cannot be ignored. The bargaining history also shows that in 1975 the Union unsuccessfully sought a unit of all clericals at the Airmotive facility.

Although the bargaining history indicates this addition to the unit may be an afterthought, bargaining history is not as material when, as here, the disputed employees were previously unrepresented, unless the change in the unit threatens the stability of established bargaining relations. *Wheeler-Van Label Co. v. NLRB,* 408 F.2d 613 (2d Cir. 1969), *cert. denied,* 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1968). Realistically, no such disruption is anticipated here;

our concern is chiefly with safeguarding the interests of these fourteen employees and, to a lesser extent, the unrepresented office clericals.

### C. Conclusion

When the unit is overinclusive, several dangers exist. A conflict in interest may develop between unit clericals and production workers; the likely result is that the interests of the minority will be overlooked or intentionally discounted. The conflict might also lead to instability in employer-employee relations. Thus, conjoining employees who lack the necessary community of interests threatens both employee rights and industrial peace. *See Allied Chemical & Alkali Workers of America, Local Union 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 172–73, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

There is also a possibility the unrepresented clericals will be unjustly affected. The history of similar compensation and working conditions for office clericals and these employees promises that the results of any collective bargaining may affect the terms and conditions of employment for office clericals. *NLRB v. Harry T. Campbell Sons' Corp.,* 407 F.2d at 978–79. This consequence is especially unfortunate when the collective bargaining may naturally discount the interests of the minority of clerical employees in the unit. Also, a gerrymandered unit undermines the integrity of the organizational desires of other employees. *Id.* at 979. *See also* J. Jenkins, *Labor Law* § 3.56 (1968).

On the basis of the above factors, we must conclude that the Board exceeded its lawful discretion by including these employees in the production unit. Therefore, we refuse to enforce its Order. We express no opinion regarding the appropriateness of the clerical unit proposed by PSA. It seems clear, however, that the fourteen employees do share a community of interest and would constitute an appropriate separate unit.[21]

---

21. Our holding does not preclude the Board from finding that the four Airmotive employees share a sufficient community of interests with unit members such that they may elect to separately join the existing unit.

See, e. g., *Retail, Wholesale and Department Store Union v. NLRB*, 128 U.S.App. D.C. 41, 385 F.2d 301 (1967); *Wheeler-Van Label Co. v. NLRB*, 408 F.2d 613 (2d Cir. 1969); N.L.R.B., *Fourteenth Annual Report* 34–35 (1949); cf. *American Radiation & Standard Sanitary Corp.*, 114 N.L.R.B. 1151 (1955) (warehouse and shipping clericals with duties, etc., analogous to those here constitute appropriate unit if joined with all other unrepresented clericals where office and plant clericals represented by same union).

The petition for review is GRANTED, and the petition for enforcement is DENIED.